2025 IL App (1st) 221279
Nos. 1-22-1279 & 1-22-1868 (consolidated)

FIRST DIVISION
March 31, 2025

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| SLYCE COAL FIRED PIZZA COMPANY, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois, |
| Plaintiff and Counterdefendant-Appellant, | ) | |
| | ) | |
| | ) | |
| | ) | No. 19 L 8297 |
| v. | ) | |
| | ) | |
| METROPOLITAN SQUARE PLAZA, LLC | ) | |
| | ) | |
| Defendant and Counterplaintiff-Appellee, | ) | |
| | ) | The Honorable |
| (Laurie Barth and Brittany Barth-Niggemann, | ) | Mary Colleen Roberts, |
| Counterdefendants-Appellants). | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Lavin and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     In these consolidated appeals, plaintiff and counterdefendant-appellant Slyce Coal Fired

Pizza Company (Slyce) appeals from circuit court orders that (1) found in favor of defendant-

counterplaintiff-appellee Metropolitan Square Plaza, LLC (Metro), on its claim for breach of the

parties' contract and (2) awarded Metro $852,421.64 in damages. Slyce separately challenges the

circuit court's subsequent order awarding Metro all of its requested attorney fees and costs

(totaling $202,034.79) without an evidentiary hearing.

¶ 2    For the following reasons, we affirm the trial court's findings that Slyce was liable to Metro for breach of contract. We affirm the award of damages, except that we reverse the $28,000 portion of the award corresponding to brokerage fees. Insofar as Slyce appeals the award of Metro's attorney fees and costs, we reverse and remand for the trial court to conduct an evidentiary hearing.

¶ 3                                BACKGROUND

¶ 4    This is a breach of contract dispute arising from failed efforts to open a pizza restaurant in a building owned by Metro in Des Plaines, Illinois.

¶ 5    Slyce operates a number of pizza restaurants in the Chicago area. Slyce is operated by Laurie Barth (Laurie) and her daughter, Brittany Barth-Niggemann (Brittany). Metro is a limited liability company that owns commercial properties. Metro's chief executive officer is Jim Karzakis (Jim).

¶ 6     In 2017, Metro purchased the property at 1504 Miner Street in Des Plaines, which was formerly the site of a Leona's restaurant. In March 2018, the parties discussed Slyce's interest in opening a restaurant at the location.

¶ 7                             Prelease Activities

¶ 8    In April 2018, Slyce and Metro entered into a letter of intent for Slyce to lease the premises from Metro. The parties discussed renovations to prepare the premises for operation as a restaurant by Slyce, with some work to be performed by Metro and some of it by Slyce. Among other work, Slyce planned for a massive pair of ovens (weighing over 6,500 pounds) to be installed on the premises.

¶ 9    In May 2018, Metro hired a contractor, My Home Architects and Engineers (My Home), operated by Dragan Djonovic (Dragan), to develop plans for Metro's portion of the renovations. Under a separate contract, Slyce hired My Home to serve as its architect.

¶ 10    On May 18, 2018, Slyce e-mailed to Jim specifications for the 6,500-pound ovens that Slyce desired on the premises. Jim forwarded those to Dragan, who prepared plans for the restaurant.

¶ 11    The restaurant plans originally contemplated that the ovens would be placed so that they would mostly rest on a preexisting concrete slab but that a portion of the ovens would "overhang" a wooden floor above the basement, which would require steel reinforcement. On August 22, 2018, Brittany again sent Jim the specifications for the ovens and asked: "Is Dragon [*sic*] going to determine the load that can be put on that slab and the small amount of the oven that will be over the basement." Jim responded: "Yes, Dragan will calculate the load and we'll add the steel to meet the requirements."

¶ 12    On November 18, 2018, Metro submitted construction plans to the City of Des Plaines (City). Shortly thereafter, Jim wrote an e-mail to Brittany and Laurie: "If all goes well final permits should be issued by mid December." In response, Laurie wrote "Sounds good and I hope the timeline holds as we NEED to be open for business no later than March/April 2019."

¶ 13                                    Lease Provisions

¶ 14    On January 31, 2019, the parties entered into a lease for the premises with a term of "Ten (10) years, one (1) month." The lease recited that its "Execution Date" was January 31, 2019. However, it also stated that its "Commencement Date" was "[t]he date of delivery of the Premises to Tenant." The lease did not define the meaning of "delivery."

¶ 15    The lease also specified that the "Rent Commencement Date" was March 1, 2019. The lease set forth the "Monthly Fixed Minimum Rent" for each month of the lease term.

¶ 16    Section 2.7 of the lease was titled "LANDLORD'S AND TENANT'S WORK" and provided, in part:

"On or before the Commencement Date, Landlord shall deliver to Tenant possession of the Premises in its then current, 'as is, where is' condition \*\*\*. \*\*\* No later than six (6) months following the Commencement Date Tenant shall complete, at its sole cost and expense, all work necessary to prepare the Premises for the conduct of Tenant's Business therein (collectively, the 'Tenant's Work'), all to be completed in accordance with the description of Tenant's Work set forth in Exhibit C attached hereto. In no event shall Tenant modify, change or otherwise alter or deviate from Tenant's Work in any material manner \*\*\* without Landlord's prior written consent."

¶ 17    Exhibit C, "TENANT'S WORK," contained a list of enumerated work items and stated that "Tenant at Tenant's expense shall perform all work, other than Landlord's work \*\*\* to put the Premises in condition to permit Tenant to conduct its business therein."

¶ 18    Elsewhere, exhibit C required that

"Tenant shall within 30 days from the date of this Lease, \*\*\* prepare and deliver to Landlord, and Landlord's architect for approval, two sets of complete plans and specifications (including all HVAC, plumbing, fire protection and electrical engineering as well as structural engineering, if applicable) covering all of Tenant's work \*\*\* certified by a licensed and registered architect and, if applicable, a licensed and registered professional engineer."

Exhibit C also required that, within 60 days from the execution date, "Tenant shall \*\*\* apply for any and all necessary permits and approvals required to permit Tenant to perform Tenant's Work."

¶ 19    Exhibit C also stated: "The Tenant's certified Architects and/or Engineers shall be responsible for all design live load calculations *** to be within the limits of the allowable live loads or limits for the existing building systems."

¶ 20    With respect to Metro's obligations, section 2.7 provided that "Landlord shall renovate the Premises as provided for in Exhibit D ('Landlord's Work')." Exhibit D stated that Landlord "shall perform all work, other than Tenant's work set forth in Section 2.7 of the Lease to put the Premises in condition to permit Tenant to conduct its business therein." Exhibit D also set forth a list of specific work items that were Metro's responsibility.

¶ 21    Section 2.7 contemplated that Metro and Slyce "shall be completing Landlord's Work and Tenant's Work *** at the Premises simultaneously." They also "agree[d] to use their best efforts to jointly coordinate Landlord's Work and Tenant's Work to minimize delays in completing such work." However, section 2.7 indicated that "Landlord's Work" could be completed up to 10 days after "Tenant's Work":

> "Landlord shall (i) complete the carpentry work, as set forth on Plans, within 30 days after approval of Plans by City of Des Plaines and issuance of building permits, and (ii) use Landlord's best efforts to complete Landlord's Work promptly, but in any event, no more than ten (10) days after Tenant completes Tenant's Work."

¶ 22    The lease contained a number of provisions regarding Metro's remedies in the event of a default. Section 14.5 contemplated that, in the event of default, Slyce shall "pay Landlord, at Landlord's option *** such expenses as Landlord may incur in connection with the Event of Default *** and all reletting, including without limitation court costs, attorneys' fees and costs, brokerage, and management fees and commissions, and all costs of preparing the Premises for

reletting." The lease also contemplated that Metro could seek either "liquidated damages," "Lump-Sum Liquidated Damages," or "Monthly Liquidated damages" under different formulas specified therein.

¶ 23    In conjunction with the lease, Brittany and Laurie executed a "Guaranty of Lease" in which each of them guaranteed "the complete and due performance by [Slyce] of all the terms" of the lease, including the payment of rent.

¶ 24                    Developments After the January 2019 Lease Execution

¶ 25    On February 19, 2019, Metro obtained a permit to execute the work reflected in the approved plans.

¶ 26    According to Metro, it first learned on February 25, 2019, that Slyce wanted to bring the ovens through the front of the building.[1] Dragan subsequently calculated that the ovens were too heavy to be brought over the existing wood floor. It was then determined that, to bring the ovens through the front of the building, the existing wood floor needed to be reinforced and replaced with steel and concrete. Metro took the lead in directing contractors to begin the floor replacement. However, the parties disputed who was ultimately responsible for the work, and they accused each other of failing to act diligently and "use their best efforts to jointly coordinate" their work, as required by section 2.7 of the lease.

¶ 27    According to Metro, Jim worked diligently on the floor replacement. However, e-mails in spring 2019 showed Slyce's increasing concern about delays in progress.

¶ 28    On March 25, 2019, Laurie wrote to Jim: "The lease assumed delivery of the premises to tenant would be by March 1, 2019, which has not occurred." Laurie suggested an "addendum to

_____

[1]This is corroborated by a February 25, 2019, e-mail in which the City's development manager e-mailed Jim: "your team is looking to install the large pizza ovens inside of the building *** and will need to have the equipment enter through the front of the building."

the lease leaving the actual 'commencement date' open until we have a firm date ***." Jim forwarded Laurie's e-mail to Metro's real estate counsel (William Bazianos). The next day, Bazianos e-mailed Slyce's counsel, stating that Metro had in fact delivered the premises and further stating that Slyce had failed to complete floor layout plans and hire contractors to complete Tenant's Work. Metro's position was that any delays "are the result of [Slyce's] failure to move forward timely with Tenant's Work."

¶ 29    On April 9, 2019, Laurie again wrote to Jim:

> "We all know when Brittany and I signed the lease with a March 1, 2019 rent commencement date it was with the understanding the building would be turned over to us at that time to complete 'Tenant's Work.' *** As of today this has not happened and the goal of opening for business by mid-May, 2019 appears to be impossible. It has always been communicated that we needed to be open by spring/summer of 2019 at the latest."

Laurie went on to state that Slyce had selected Joe Altmann as its "construction manager" instead of Dragan, citing "delays [Dragan] has caused getting the plan done and missing deadlines and meetings."

¶ 30    Laurie further stated that there was an "open hole in the floor" that prevented Slyce and its contractors from beginning the Tenant's Work. She expressed concern that this would delay the restaurant's opening "to potentially July 2019 resulting in missing out on half of the summer business season."

¶ 31    In the same April 9, 2019, e-mail, Laurie questioned Slyce's obligation to pay rent:

"What incentive do you have to complete 'Landlord's Work' if we are paying rent? I recall you telling Brittany and I we would not have to pay rent until we open. When the lease was being negotiated and you were doing so much to improve the building we both felt it equitable for us to pay rent even though you had told us rent would commence once we open. Never did we imagine this much of a delay would occur."

Laurie indicated her understanding that the parties would meet the next day to "clarify landlord and tenant work" and a timeline for completion.

¶ 32    The record reflects subsequent communications between Jim and Brittany regarding the division of labor for remaining work. On April 12, 2019, Jim sent an e-mail to Brittany and Altmann with the subject regarding "the steel beam install over the basement." He asked: "Should we cut the wood basement ceiling trusses to lower the steel beams into place *** in order to support the transportation of the ovens over the basement?" In the same e-mail, Jim asked if Slyce agreed "to equally share the cost of the structural engineering report, steel beams, metal deck, and wire mesh install in order to support the transportation of the pizza ovens over the basement floor?" Jim indicated the total cost would be $9,195.02. He also stated that Metro would pay for the concrete.

¶ 33    Slyce did not respond directly to Jim's question about sharing costs. Nevertheless, the parties continued to communicate about the steel and concrete work. On April 26, 2019, Brittany e-mailed Jim and Dragan to ask "how the steel inspection went" and whether they were "on track to pour the floor Thursday 5/2?" In response, Jim indicated that the steel contractor was correcting some work and that the "concrete pour was rescheduled."

¶ 34    On May 15, 2019, Metro submitted plans to the City for new floor work. On May 22, 2019, the City requested modifications to those plans.

¶ 35                              Communications Break Down in June 2019

¶ 36    It is undisputed that Slyce paid rent for the months of March, April, and May 2019. However, communications between Slyce and Metro broke down in June 2019. Slyce did not pay any more rent.

¶ 37    On June 4, 2019, Jim e-mailed Brittany and stated that Metro would be completing the "Steel/concrete work over the basement." Later on June 4, 2019, Jim sent a message in which he suggested that Slyce could take over the floor replacement:

> "Also, we prefer handing over the completed and inspected work for
> the steel beams/metal decking/concrete floor over the basement
> since they're structural to the building. In terms of next steps, we're
> waiting for plan approval from the City of Des Plaines in order to
> proceed with the concrete pre-pour inspection.
>
>      Let us know your preferences on moving forward and I'm
> sure we can arrive at a mutually beneficial solution."

¶ 38    In a response, Laurie complained of Metro's lack of communication and "repeated delays with no explanation." Later on June 4, 2019, Laurie wrote to Jim that she learned the City had requested revisions on the plans for the steel and concrete work. She wrote: "We need to know how much longer this could take because it is out of our hands. All while rent continues to be collected and used as leverage to keep stringing us along. This is so unfair and everyone knows it."

¶ 39    On June 5, 2019, Jim responded that the City's comments on the plans were not unusual and that Dragan would address them. In the same e-mail, Jim also criticized Slyce:

> "[W]e have been very patient and have acted in good faith throughout our relationship with the Slyce team ***. However, rather than working collaboratively as we agreed to in the Lease, you continue to make unfounded accusations ***. You're fully aware that *** Slyce has not provided the Landlord with the required Tenant permitted and approved plans that you agreed to in the Lease. *** The Landlord's contractors can't be guessing what you want if your plans are not final. Therefore any delays for Tenant's work are your sole responsibility."

¶ 40    On June 12, 2019, Metro received a permit from the City for the floor replacement work. On June 17, Laurie e-mailed Jim, again stating that Metro had failed to update Slyce on the work. She questioned why Metro had not informed Slyce that the City had approved the revised plans for the floor work. Later that day, Jim copied Metro's legal counsel and told Laurie: "You continue to operate in a manner that is not consistent with the terms of the Lease. Going forward, you are directed to correspond only with my attorneys."

¶ 41    Laurie responded that "any deadlines in the lease must be adjusted to allow us to move forward." Laurie also stated: "It is obvious to me you are posturing to get [Slyce] to share in the cost of the steel, floor and concrete. If you had been honest with us from the beginning we would have worked this out."

¶ 42    Metro continued to work on the floor replacement. Concrete for the floor was poured on June 22, 2019.

¶ 43                    Slyce Sues Metro, and Metro Counterclaims

¶ 44    On July 26, 2019, Slyce commenced this litigation by filing a complaint against Metro containing several counts, including breach of contract and unjust enrichment. After Metro filed a motion to dismiss, the trial court dismissed all counts except Slyce's claims for breach of contract and unjust enrichment.

¶ 45    On February 4, 2020, Metro filed an answer and a counterclaim with two counts. The first count asserted breach of contract, insofar as Slyce breached its lease obligations by, *inter alia*, failing to pay rent, failing to provide Metro "two sets of complete plans and specifications" within 30 days from the date of the lease as called for by exhibit C, and failing to timely "apply for any and all necessary permits" for Tenant's Work, as required by exhibit C. The second count was directed against Laurie and Brittany, as Slyce's guarantors under the lease.

¶ 46                                Trial

¶ 47    The record reflects that the trial court presided over a settlement conference in January 2022, which proved unsuccessful. The parties proceeded to a bench trial that commenced on April 11, 2022.

¶ 48    In its opening argument, Slyce's counsel argued Metro did not use its best efforts to complete its work promptly, especially the floor replacement. Counsel argued that Slyce could not do the "Tenant's Work" at the property because Metro created "a hole in the ground" inside the premises. Slyce argued that Metro took on the responsibility for the floor replacement, and Slyce relied on Metro to complete the work.

¶ 49    In Metro's opening, counsel pointed out that Slyce stopped paying rent after May 2019. Metro argued that Slyce caused it to invest over $100,000 in construction costs before Slyce "walked away" from the project. Metro argued that the floor replacement work was necessitated

by Slyce's decision to bring the ovens through the front of the building, which was not communicated to Metro until after the building plans were already approved. Metro's counsel emphasized that, under the lease, Slyce was required to complete its work six months after the commencement date, whereas Metro had another 10 days to complete "Landlord's Work." Counsel argued that Metro was "trying to coordinate" the work but Slyce did not make similar efforts.

¶ 50                                    Altmann

¶ 51     Slyce called Altmann, who testified he remodeled homes and commercial spaces. Altmann was hired by Slyce to "complete the interior build-out" before the restaurant opened, but the property never became ready for him to do that work.

¶ 52     Altmann had served as Slyce's construction manager in remodeling its three other restaurants, which used the same sort of 6,500-pound pizza ovens at issue in this case. Due to their size, the ovens needed to either be brought in through a large existing opening or by demolishing part of a building. Altmann worked with a company called Diamond Rigging to install the ovens at other Slyce locations. Regarding the Des Plaines premises at issue, Altmann recalled that he asked his contact at Diamond Rigging to discuss how to transport the ovens over the existing wood floor. As the rear entrance to the premises was narrow, Altmann always believed that the plan was for the ovens to come through the front. The ovens could not have been brought through the rear, without making a hole in the wall.

¶ 53     Altmann visited the premises three times. He first visited in February 2019. He recalled there was a large hole in the floor, which precluded the ovens from being brought in. He again visited in March 2019, and the condition of the building was "[b]asically the way I saw it the first time." Altmann last visited the building site in April 2019, when he met with Brittany, Jim, and

"the architect" (Dragan). They briefly discussed the transportation of the ovens into the building, but "it couldn't be done until the floor's completed."

¶ 54    Altmann testified that he never started work at the premises because the ovens needed to be in place for him to do his work. When he visited the property, he did not believe it was in a safe condition for him to work, as there was "construction debris all over."

¶ 55    On cross-examination, Altmann acknowledged he is not an engineer or architect or a licensed general contractor. He never saw the lease or any "permitted drawings." His understanding of what Slyce and Metro would do was based on his discussions with Brittany. Altmann agreed that he "did nothing" in terms of actual work at the site.

¶ 56    Altmann did not believe that the wood floor needed to be replaced to support the ovens, as he was told by Diamond Rigging that "steel plates" could be used to move the ovens. Altmann later acknowledged that calculations were done to assess the weight tolerance of the floor and that "it was determined the floor had to be replaced."

¶ 57                                    Brittany

¶ 58    Brittany testified that, in November 2018, she expressed to Metro the need for the restaurant to be open for business by March or April 2019. Slyce wanted to open by then in order to train staff and be in business before the busy summer season. Brittany also testified that Slyce was planning to open a restaurant in Vernon Hills later in 2019 and that Slyce hoped to have at least six months between the two openings. Brittany testified that Jim was aware that this was "dictating the timeline" to open the Des Plaines location.

¶ 59    Brittany testified to her understanding that Metro, not Slyce, was responsible for any "structural" work. She believed the scope of Slyce's work was mostly "cosmetic," meaning the

interior "build-out to make it a restaurant." Brittany testified that exhibit C did not state it was tenant's responsibility to do any "structural or concrete work, flooring work."

¶ 60     Brittany testified that Slyce submitted the specifications for the ovens to Metro and Dragan, and she understood that they would take them into consideration when finalizing the floor plans. She confirmed that by May 18, 2018, Metro and Dragan knew the size and weight of the ovens.

¶ 61     Slyce ordered the ovens to be shipped from the manufacturer to Diamond Rigging, who was to transport the ovens into the building. Brittany understood the ovens were going to be brought in through the front, because they were too wide to be brought through the rear, without opening up a wall. Under section 2.7 of the lease, Slyce would need Metro's written consent before opening a wall or the roof to bring in the ovens. Metro never gave Slyce such written consent. Brittany similarly testified that Slyce could not reinforce the floor without Metro's consent.

¶ 62     Brittany explained that were two separate issues pertaining to support for the ovens, relating to (1) support of a portion of the ovens' planned final resting place and (2) reinforcement of the floor over which the ovens were to be transported. The planned resting place for the ovens was on a concrete slab in the kitchen. However, a portion of the ovens was "going to hang off" the concrete by a number of feet. The floor beneath that portion needed to be reinforced with steel beams.

¶ 63     A separate issue arose regarding the need to reinforce the floor to move the ovens to their planned resting place. Brittany recalled that around February 2019 she was informed by Jim or Dragan of the need for structural work, including steel and concrete, to reinforce the floor. She understood that Metro would perform that work. Brittany stated that she later found out that Metro did not get the permits for steel and concrete pouring until April 2019 or later.

¶ 64    Brittany was asked about Laurie's March 2019 e-mail proposing an addendum to the lease. Brittany recalled that Slyce wanted to amend the lease because it was "evident that we were not going to be meeting our timeline." Slyce wanted an addendum with a "realistic timeline" for the completion of the work, but the parties never amended the lease.

¶ 65    Brittany was also asked about the April 9, 2019, e-mail from Laurie to Jim referencing delays and questioning Slyce's obligation to pay rent. Brittany testified that Slyce was losing revenue by not being able to open by May 2019. Brittany elsewhere stated her understanding was that Slyce was not supposed to "be paying rent until we were opened." Slyce began paying rent in March, "assuming that the building would have been turned over to us by then even though we had originally negotiated not paying rent *** until we were opened." When asked why Slyce stopped paying rent after May 2019, Brittany said: "There was still a hole in the floor and it just didn't look like we were getting anywhere."

¶ 66    Brittany was asked about Jim's April 12, 2019, e-mail asking if Slyce would share the cost of steel beams to reinforce the floor. Brittany recalled this was "kind of a shock" because she did not believe Slyce was responsible for that work. Brittany recalled that on April 18, 2019, she met with Jim, Dragan, and Joe, with Laurie participating by phone. Based on that meeting, it was her understanding that Metro would finish the floor replacement work.

¶ 67    Brittany testified that Laurie's e-mail to Jim on June 4, 2019, expressed that it was "not fair that we are still paying rent, and we're not able to even do our tenant work" because there was "still a hole" in the building. Slyce was frustrated that it "had been waiting since February to get that hole filled in with concrete and steel."

¶ 68    Brittany testified that Slyce hired Dragan as its "architect" to do the floor plan and mechanical, electrical, and plumbing plans (MEPs). However, Dragan delayed and eventually told

her that TriMark, Slyce's kitchen equipment supplier, would do the MEPs. Brittany eventually submitted the plans to the City herself, because Dragan was nonresponsive.

¶ 69    Brittany testified that Slyce used its best efforts to coordinate with Metro. For the most part, she believed that she and Jim "worked really well together."

¶ 70    On cross-examination, Brittany testified that Slyce considered "every option" as to how to bring the ovens in. Slyce decided that moving them through the front "made the most sense" because Slyce was already planning a modification to the front that would create a hole in the wall. Brittany acknowledged that on February 25, 2019, she discussed with Jim that the ovens were going to be brought in through the front of the building.

¶ 71    Brittany recalled that she, Jim, and Dragan discussed two options to move the ovens across the wood floor: one was to place steel plates over the wood floor (as suggested by Diamond Rigging), and the other was to replace the floor. It was "Jim's choice" to replace the floor with steel and concrete, after Dragan said the floor would not withstand the ovens' weight. Brittany agreed that the lease did not contemplate the floor being replaced or reinforced, and it did not indicate whose responsibility it would be. Jim "took it upon himself" to do that work.

¶ 72    Regarding Jim's e-mail asking to share costs for the steel beam installation, Brittany acknowledged she did not respond directly to that request, because they were setting up a meeting that eventually took place on April 18.

¶ 73    Also on cross-examination, Brittany acknowledged that Slyce agreed to a rent commencement date of March 1, 2019. She stated it was "originally discussed" that Slyce would not pay rent until the restaurant opened, but she acknowledged this was not a lease term. Brittany acknowledged there was a breach when Slyce stopped paying rent.

¶ 74    Brittany was asked about the language in exhibit C that, within 60 days after the execution date, the tenant shall "apply for any and all necessary permits and approvals required to permit Tenant to perform Tenant's Work." She acknowledged Slyce had not done so. She also acknowledged that exhibit C called for Slyce to deliver to Metro, within 30 days of the lease, "two sets of complete plans and specifications." She agreed this was not done, although she testified that this was partially due to Dragan's failure to complete the plans.

¶ 75    Brittany acknowledged that section 2.7 of the lease provided that it could take up to six months to complete "Tenant's Work," although she testified that Slyce anticipated that it would take less time. She acknowledged that Slyce sued Metro in July 2019, before six months had passed from the execution of the lease.

¶ 76                                    Laurie

¶ 77    Laurie testified that she was involved in Slyce's lease negotiations and financial decisions but that she did not have much role in monitoring the construction. Brittany monitored progress at the site and communicated with Jim on a daily basis. Laurie only "came into it when things got tough" with respect to issues related to the lease.

¶ 78    Laurie was not involved in deciding how to bring the ovens into the building. She understood that in February or March 2019 the decision was made that the floor needed to be reinforced and concrete needed to be poured.

¶ 79    Laurie was asked about her March 25, 2019, e-mail, in which she proposed a lease addendum. She testified that by then it was obvious that "our deadlines were not going to be met, and the lease had terms that were time sensitive that I could see would be a problem." Due to Metro's delays, Slyce could not complete the "Tenant's Work" called for by the lease. Metro never agreed to amend the lease.

¶ 80    Laurie testified that she sent her April 9, 2019, e-mail asking to establish a timeline because Slyce was getting "concerned and frustrated at the delays" with the steel and concrete work and felt like it was "being strung along." Laurie testified that Slyce agreed to a March 1, 2019, rent commencement date because they "assum[ed] that everything was going to go smoothly and we would be open for business no later than May." Slyce communicated to Metro that it wanted to open the restaurant by May 2019. Laurie testified that Slyce paid March, April, and May rent.

¶ 81    Laurie testified that on or about April 14, 2019, she participated by phone in a meeting involving Brittany, Joe, Dragan, and Jim. Laurie's understanding was that Metro was responsible for doing the steel and concrete flooring work, but there was "no transparency or communication [from Metro] about what was really happening."

¶ 82    On cross-examination, Laurie testified that Slyce could not do Tenant's Work because the floor was torn up. She said the planned path for the ovens was chosen by Slyce and Metro together but that she was not involved. She acknowleged the MEP drawings were Slyce's responsibility.

¶ 83                                    Jim

¶ 84    Jim testified that Metro purchased the premises, which had been a Leona's restaurant, in November 2017. Jim met Brittany in March 2018 and discussed updating the property for Slyce. Slyce did not want the existing layout; it wanted a "custom concept," so the property needed to be "demoed."

¶ 85    In May 2018, he and Slyce met with Dragan to discuss the layout. The first plans were developed on June 4, 2018. There were 12 drafts of the plans between June and November 2018, with Laurie and Brittany commenting on each draft. The plans were submitted to the City in November 2018. After the City made comments, revised plans were approved in January 2019. Metro obtained a permit for the interior remodeling on February 19, 2019.

¶ 86     Jim testified that none of the "Landlord's Work" set forth in exhibit D to the lease included replacement of the wood floor.

¶ 87     He recalled that in 2018 Brittany informed him that there would be a "slight overhang" of the pizza ovens "over the existing wood floor." They planned to add support under that portion of the wood floor using steel beam and columns. This plan was incorporated into the design that was approved by the City in February 2019. However, "that design plan was specific for the pizza ovens coming in from the rear to that resting place with the overhang."

¶ 88     Jim testified that a February 25, 2019, conversation with Brittany was the first time he was informed the ovens would be coming through the front. This required a change to the plans previously approved by the City, as the existing wood floor would not support the weight of the ovens.[2]

¶ 89     In early March 2019, Brittany told Jim that the trucking company (Diamond Rigging) recommended moving the ovens onto steel plates to bring them "over the wood floor over the basement." Jim doubted that it would be safe to put that much weight on the floor, so he asked "the architect [Dragan] to do a calculation" as to whether the existing floor would support the ovens. Dragan's calculation showed that steel beams were required to support the 6,500-pound ovens.

¶ 90     Later in March 2019, Jim discussed with Brittany a more "comprehensive solution" to support the floor by adding "steel beams, steel decking and concrete." They agreed that Jim would contact the steel contractor, who was already working at the site under the previously-approved plans.

---

[2]Jim testified the pizza ovens were going to be installed in the same final location, regardless of the direction that they would be brought in.

¶ 91    Jim recalled that on April 4, 2019, he and Brittany met at the site with Altmann, whom he understood was Slyce's general contractor. Jim suggested that Altmann could run the floor replacement project; Altmann said he would think about it. On April 5, there was further discussion with Jim, Laurie, and Brittany as to how to "move forward in the most efficient manner." On April 6, Altmann called Jim. After that conversation, Metro prepared a budget of the materials for the floor replacement and asked the steel contractor to begin work.

¶ 92    Jim testified that his April 12, 2019, e-mail asked for Slyce's agreement to cut the floor joists, so that steel beams could be lowered into place. Jim testified this was a "point of no return" because, after the beams are lowered, they are so heavy it is nearly impossible to bring them out. In the same e-mail, Jim proposed that Slyce would pay half of the cost of the steel, about $4,600.

¶ 93    Jim testified that the floor replacement work required a permit because it was a change to the plans previously approved by the City. On April 16, Jim was copied on plans from MyHome and Brittany. Jim testified that Metro expected Slyce to submit the revision to the City for approval but Slyce delayed in doing so. According to Jim, Metro was frustrated with Slyce's "lack of progress," so Metro eventually "stepped in and asked [Dragan] to give us plans" for the floor replacement work. Metro submitted the plans and obtained the permit.

¶ 94    Jim testified that on April 19, 2019, he met with Brittany, Altmann, and Dragan. They agreed that "Metro should continue" to have contractors proceed with the steel and concrete work. Metro ordered and paid for steel beams and metal decking.

¶ 95    Jim testified that Metro was obligated to continue the permitted work, even after Slyce left the project, so that the City would be satisfied that the building was safe. Concrete was ultimately poured on June 22, 2019.

¶ 96    Jim testified that Metro did deliver the premises to Slyce, as Brittany and Slyce's contractors were coming to the work site. Jim recalled he had weekly calls with Britany about the project and met with her frequently at the premises. Jim enjoyed working with Brittany and had no issues with her "until the floor work over the basement."

¶ 97    Jim testified at length about Metro's claimed damages. He testified that Slyce's abandonment of the project "devastated" the value of the premises, which became a "gutted shell" due to Metro's efforts to meet Slyce's custom requirements.

¶ 98    Metro's counsel asked Jim about section 14.5 of the lease, which provides that the landlord may recover costs incurred as a result of a default as well as liquidated damages.[3]

---

[3]That provision states, in relevant part:

> "In the event of any Event of Default ***, then in addition to and not in lieu of, Landlord's other remedies *** (1) the Rent, including Utility Charges, shall thereupon become due and payable up to the time of such re-entry, termination or dispossession; and (2) Landlord may relet the Premises *** and (3) Tenant or its legal representative shall also pay Landlord, at Landlord's option *** such expenses as Landlord may incur in connection with the Event of Default or Deliberate Event of Default and all reletting, including without limitation court costs, attorneys' fees and costs, brokerage, and management fees and commission, and all costs of preparing the Premises for reletting, plus either (a) Lump-Sum Liquidated Damages or (b) as liquidated damages *** for each month of the period which would otherwise have constituted the balance of the Term, the excess, if any, of monthly liquidated damages ('*Monthly Liquidated Damages*') equal to the sum of the then-applicable monthly installment of Fixed Minimum Rent, plus the monthly portion of the payment of Tax Rent that would have been payable for the period in question but for such reentry, termination, or dispossession, plus Utility Charges payable for such month computed on the basis of the average monthly charge for the said three (3) preceding Adjustment Years or entire preceding portion of the Term *** over the net amount, if any, of the rents actually collected on account of the lease or leases of the Premises for such month." (Emphasis in original.)

¶ 99      Jim testified that as of April 30, 2022, the sum of outstanding rent, taxes, and utilities was $365,255. Jim also testified that Metro paid $135,113.88 in construction expenses in efforts to customize the space for Slyce.

¶ 100  Jim additionally testified that Metro sought $327,626 for "Lump Sum Liquidated Damages," using the calculation set forth in section 13.2 of the lease. That provision defines "Lump Sum Liquidated Damages" to mean:

> "the difference between: the sum of the annual Fixed Minimum Rent, the Tax Rent payable in the year immediately preceding such termination, and Utility Charges payable in the last preceding Adjustment Year, all multiplied by the number of years and fraction of a year then constituting the unexpired Term, discounted at the rate of four percent (4%) per annum to present worth, minus the fair and reasonable annual rental value of the Premises for such period, also discounted at the rate of four percent (4%) per annum to present worth."

¶ 101   Jim testified that Metro's calculation under this formula resulted in $327,626. Specifically, the sum of future rent through the end of the lease (discounted to today's dollars) was $744,270. From that number, Metro subtracted its estimate of reasonable rent for the remainder of the lease term, which was $550,630. That is, $744,270 minus $550,630 resulted in $327,626 of "Lump Sum Liquidated Damages."

¶ 102   Jim further testified that Metro had unsuccessfully attempted to relet the property since September 2019, despite hiring two brokers. Metro had an agreement with a broker calling for a

4% brokerage fee. Metro "estimated $700,000" for remaining rent under the lease period, so Jim expected Metro would have to pay $28,000 for a brokerage commission.

¶ 103   On cross-examination, Jim agreed that Metro received the specifications of the ovens in May 2018. Jim agreed that the floor replacement work was not part of either "Landlord's Work" set forth in exhibit D or "Tenant's Work" in exhibit C. Jim testified the floor was opened up in March 2019, and he acknowledged that concrete was not poured until June 22, 2019. Asked about Laurie's March 2019 request for a lease amendment, Jim testified there was no need to amend the lease at that time because Slyce had six months to complete the work after the January 31, 2019, commencement date.

¶ 104                                    Dragan

¶ 105   Dragan testified that Metro was a long-term client, and he acted as Metro's general contractor with respect to the premises. Under a separate contract, he provided architectural services for Slyce.

¶ 106   Beginning around May 2018, Dragan was involved in weekly meetings with Slyce and Metro. He prepared "over 10 revisions" of drawings for the proposed restaurant before they were submitted to the City in November 2018. After the City made comments, revised plans were submitted in January 2019. In making the drawings, Dragan believed the ovens were going to be brought in "from the back where we have solid concrete floor."

¶ 107   Dragan did not know Slyce planned to bring the ovens through the front until March 2019, when he discussed it with Diamond Rigging. Dragan did new calculations as to how much weight the floor could bear. After his calculations, the plan was to replace the floor and add steel and concrete to support the transport of the ovens.

¶ 108   Dragan testified that from late March to May 2019, Slyce continued to make other revisions to their plans for the interior of the building. Dragan made a number of corresponding revisions to the architectural drawings, but he did not submit them to the City because Slyce never communicated that it had no further revisions.

¶ 109   On cross-examination, Dragan agreed that he contracted with Slyce to prepare MEP drawings. He agreed the planned final resting place of the ovens was the same whether they came through the front or the back. He believed the "only logical way" to bring the ovens in was through the back, where there was a solid concrete floor.

¶ 110                               Closing Arguments

¶ 111   In closing arguments, Slyce claimed that Metro took ownership of the floor replacement work and Metro left a hole in the property that "delayed everything" and made it impossible for Slyce to carry out "Tenant's Work" in the time frame set forth in the lease. As Metro "assumed ownership" of the floor replacement work, counsel argued any delays should be imputed to Metro. Counsel argued that Slyce's e-mails asking Jim about the status of the work contradicted Jim's testimony that he kept Slyce apprised in meetings.

¶ 112   Metro's counsel argued that Slyce was responsible for getting the ovens into the building but had "no plan" how to do so. After Dragan calculated that the existing floor would not support moving the ovens through the front, Slyce was "stuck" because the building had to be modified by putting in a concrete floor. Counsel argued that Metro could not be blamed for delays from the floor replacement work, because as soon as Jim learned about the need for it, he acted to engage contractors for the work. Metro argued Slyce "permitted [Jim] to take control" but abandoned the project after Metro incurred $135,000 in construction expenses. As to Metro's counterclaim,

counsel argued that Slyce breached the lease in several ways, including by failing to pay rent and failing to obtain completed plans and necessary permits.

¶ 113   In Slyce's posttrial submission, it argued that it proved Metro breached the lease by failing to use its best efforts to jointly coordinate its work with Slyce. As support, it cited Slyce's March 2019 e-mail requesting an addendum to the lease, other Slyce e-mails from April 2019, and Metro's alleged failure to coordinate with Slyce to obtain a new permit from the City for the steel and concrete work. Elsewhere, Slyce's posttrial submission argued that, if the court found in favor of Metro on its counterclaim, Metro was not entitled to liquidated damages, as they were penal in nature. Slyce also disputed whether Metro could recover the $28,000 it sought in brokerage fees, because they were a speculative future expense.

¶ 114                                          Trial Court Findings

¶ 115   Following trial, the court orally announced its findings on April 22, 2022.

¶ 116   The court first addressed Slyce's claims. The trial court found the unjust enrichment claim (count II) failed as a matter of law because a contract governed the parties' relationship.

¶ 117   Turning to Slyce's breach of contract claim, the court found the evidence did not support the allegation that Metro "failed to use its best efforts to jointly coordinate" with Slyce. The court noted that, although Slyce alleged that Metro failed to respond to Laurie's March 2019 e-mail suggesting an addendum to the lease, the very next day Metro responded via an e-mail from its attorney. The court also noted Jim's April 12, 2019, e-mail "asking permission to actually cut the floor of the ceiling so that the work on the floor could commence," which also included a "proposal to share the costs of the floor replacement." The court found that Slyce "never responded" to that proposal. The court also found the evidence showed that on April 18, 2019, there was "a game plan meeting" involving Slyce and Metro. The court found "overwhelming" evidence that Metro

performed under the lease, including an "abundance of evidence of Metro trying to jointly coordinate with Slyce."

¶ 118    The court also remarked that the lease did not indicate that the restaurant needed to be open for business by a particular date. Although Slyce "had an expectation," this was "not a term of the contract."

¶ 119    The court further determined that any delay from the floor replacement did not constitute a material breach by Metro that relieved Slyce of its duty to perform, as the delay did not "defeat[ ] the benefit of the bargain." The court found:

> "Metro worked diligently to replace the floor, and to push the project forward even in light of Slyce's refusal to work with Metro to accommodate the move and placement of the ovens. *** When it became clear that Slyce wanted to bring the ovens in through the front and Slyce had no plan for that with respect to how the load of that would be supported by the floor, Metro came in and said let me help you. From that time forward Slyce did nothing to move those ovens into place, nothing except to complain about how long it was taking. So I find that there was no material breach by Metro [that] would release Slyce from this contract."

¶ 120    Turning to Metro's counterclaim for breach of contract, the court noted that Slyce had an obligation to pay rent under the lease, unless there was a constructive eviction or a material breach by Metro. The court reiterated there was no material breach by Slyce. The court further found that there was no constructive eviction.[4] Thus, Slyce was in breach of the lease for failure to pay rent.

---

[4]The trial court also noted that Slyce had not pleaded constructive eviction as a defense.

¶ 121   The court also found Slyce breached the lease in other ways, including failure to complete "Tenant's Work"; "fail[ure] to calculate proper design loads for the move of the ovens"; failure to provide Metro with "the mechanical, electrical, and plumbing plans" required by the lease; and failure to timely apply for necessary permits for Slyce to perform its work. As to count II (breach of guaranty), the court also found that Brittany and Laurie were liable as guarantors for Metro's damages.

¶ 122   Turning to damages, the court found Metro proved it paid $111,910.38 in construction expenses related to breach of the lease.[5] The court also found Metro entitled to the $327,626.48 it requested as "lump sum liquidated damages," finding that the lease's liquidated damage provision was enforceable.

¶ 123   In addition, the court also found that Metro had proven $365,255.76 in damages for "lost rent, taxes, and utilities to date." It also found Metro was entitled to $28,000 for brokerage fees, citing Jim's testimony about attempts to relet the property. The court also awarded prejudgment interest in the amount of $19,629.02.

¶ 124   On April 25, 2022, the trial court issued a written order that entered judgment in Metro's favor and specified the following damages:

| | |
|---|---|
| Rent + Taxes + Utilities to 4/30/2022 | $365,255.76 |
| Construction Expenses | $111,910.38 |
| Lump Sum Liquidated Damages | $327,626.48 |
| Brokerage Fees | $28,000.00 |
| Prejudgment Simple Interest on Rent | $19,629.02 |
| | |
| Total | $852,421.64 |

---

[5]This amount of this award was somewhat less than the approximately $135,000 in construction expenses first testified to by Jim, since Metro subsequently acknowledged that certain of those expenses would have been incurred by Metro regardless of the Slyce lease.

The April 25, 2022, written order further specified that "the Lease agreement allows for the award of attorney's fees and court costs," to which Metro was entitled. The court directed Metro to prepare a petition for attorney fees and costs.

¶ 125   The April 25, 2022, order specified that it was a final and appealable order. In May 2022, the parties filed a joint motion asking the court to state that the April 25, 2022, order was "not final and appealable until attorney fees and costs are determined without an express written finding that there is no just reason for delaying the enforcement or appeal." Metro also asked the court to clarify that the judgment was entered against Slyce as well as its guarantors, Brittany and Laurie.

¶ 126   On May 23, 2022, the court struck the phrase "final and appealable" from the April 25, 2022, order. The court indicated the order would be deemed final and appealable when it determined the attorney fees and costs to be awarded to Metro.

¶ 127   Metro submitted a petition for attorney fees and costs, seeking $187,413.45 in fees and $14,621.04 in costs. In support, Metro attached a declaration by its lead attorney, Darrell Graham of the firm Roeser Tanner & Graham LLC, that itemized the fees billed by each attorney and legal assistant on the case, attaching invoices. Metro also attached a declaration by its real estate attorney, William Bazianos of Bazianos Law, attaching invoices for fees of $11,283.75.

¶ 128   On July 26, 2022, the court issued an order clarifying that the April 2022 judgment was entered against Slyce and its guarantors (Laurie and Brittany) jointly and severally. At the same time, the court made a written finding that there was no just reason for delaying enforcement or appeal. Slyce filed a notice of appeal (No. 1-22-1279) challenging the April 25, 2022, order, as modified on May 23 and July 26, 2022.

¶ 129            The Court Grants Metro All Requested Attorney Fees and Costs

¶ 130    In response to Metro's fee petition, Slyce requested an evidentiary hearing. Slyce asserted various objections to the billing entries submitted by Metro's attorneys, including that entries were "block billing," vague or duplicative, or billed attorney time for clerical tasks. Slyce also argued Metro was not entitled to reimbursement for fees incurred by its real estate attorney. Slyce otherwise claimed the requested fees were unreasonable.

¶ 131    On November 16, 2022, the court orally informed the parties that it found the requested fees were reasonable. It also stated that it did not find an evidentiary hearing was necessary. On the same date, the court issued a written order awarding Metro the entire amount of requested fees, totaling $187,413.75, plus all requested costs, $14,621.04. That order included the following language (which also appeared in Metro's fee petition):

> "This case should have been a straightforward breach of contract action, but it was made more complex by the injection of multiple additional claims by Slyce and the positions Slyce took during the litigation ***. This is not a situation where [Metro] or its counsel provoked or prolonged litigation in order to run up fees. Indeed, Slyce initiated the lawsuit. More importantly, Slyce had multiple opportunities to resolve this dispute at a fraction of the judgment but consistently took the position that [Metro']s settlement proposals were unreasonable and made in bad faith. [Metro] received a very favorable result, and the fees incurred were in no way disproportionate to the recovery. (*i.e.* fees were approximately 20% of the recovery, not including recovery of fees and costs)."

¶ 132  Slyce filed a second notice of appeal (No. 1-22-1868), directed to the November 16, 2022, order awarding Metro's attorney fees and costs. That appeal was subsequently consolidated with appeal No. 1-22-1279.

¶ 133                                    ANALYSIS

¶ 134  On appeal, Slyce does not dispute that Slyce breached the lease, including by failing to pay rent after May 2019. Instead, it asserts a number of reasons why Metro's conduct constituted a material breach or otherwise excused Slyce's failure to perform under the lease. Separate from any issue of liability, Slyce takes issue with many aspects of the trial court's award of damages. In addition, Slyce asserts the trial court erred in awarding the full amount of Metro's requested attorney fees and costs, without conducting an evidentiary hearing.

¶ 135   As Slyce acknowledges, a deferential standard applies to the trial court's findings of fact after a bench trial. "Generally, after a bench trial, our standard of review is whether the order or judgment is against the manifest weight of the evidence." *Archon Construction Co. v. U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, ¶ 26. Under this standard, "we give deference to the trial court as the finder of fact, because it is in the best position to observe the conduct and demeanor of the parties and witnesses. [Citation.]" *Id.* A judgment is against the manifest weight of the evidence only if the opposite conclusion is apparent or if the findings appear to be arbitrary, unreasonable, or not based on the evidence. *Martinez v. River Park Place, LLC*, 2012 IL App (1st) 111478, ¶ 14.

¶ 136                    Whether Metro Committed a Material Breach

¶ 137  We turn to Slyce's claims that it cannot be held liable for a breach, because Metro committed one or more material breaches of the lease that excused Slyce's nonperformance. Specifically, Slyce alleges that (1) Metro failed to deliver possession of the premises to Slyce, (2) Metro failed to complete the "Landlord's Work" set forth in Exhibit D, (3) Metro failed to

complete the floor replacement, (4) Metro failed to perform work promptly, (5) Metro failed to complete carpentry work within 30 days after approval of plans by the City, (6) Metro "created conditions preventing Slyce's work," and (7) Metro "Failed to Coordinate and Communicate its Work." These claims of material breach are unavailing.

¶ 138    A party suing for breach of contract must prove that it has substantially complied with all the material terms of the agreement. *InsureOne Independent Insurance Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 33. A mere " 'partial breach by one party *** does not justify the other party's subsequent failure to perform.' " *Id.* (quoting *Israel v. National Canada Corp.*, 276 Ill. App. 3d 454, 460 (1995)). "Only a material breach of a contract provision will justify nonperformance by the other party." *Id.* That is, "a material breach of a contract provision by one party may be grounds for releasing the other party from his contractual obligations." *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 70 (2006). "[W]hether or not a material breach of contract has been committed is a question of fact," and the trial court's finding will not be disturbed unless it is against the manifest weight of the evidence. *Id.* at 72.

¶ 139    The test of whether a breach is material is whether it is so substantial and fundamental as to defeat the objects of the parties in making the agreement or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement. *InsureOne*, 2012 IL App (1st) 092385, ¶ 43. "The breach must be so material and important to justify the injured party in regarding the whole transaction at an end." (Internal quotation marks omitted.) *Id.*

¶ 140    We address the various ways in which Slyce alleges that Metro materially breached the lease. We reject Slyce's claim that Metro materially breached the lease by failing to deliver possession of the premises to Slyce. As Metro points out, Slyce never argued at trial that Metro

materially breached by failing to "deliver" the premises. Indeed, the *only* breach that Slyce alleged in its posttrial brief was that Metro failed to use its best efforts to jointly coordinate its work with Slyce. Thus, this argument is forfeited on appeal. " 'It is well settled that issues not raised in the trial court are deemed forfeited and may not be raised for the first time on appeal.' " *Jameson Real Estate, LLC v. Ahmed*, 2018 IL App (1st) 171534, ¶ 75 (quoting *Martinez*, 2012 IL App (1st) 111478, ¶ 29); see *Fox v. Heimann*, 375 Ill. App. 3d 35, 45-46 (2007) (defense not raised at trial is waived for purposes of review).

¶ 141   In any event, as Slyce acknowledges, the lease did not define the term "delivery." Certainly, the lease does not equate "delivery" of the premises with it being ready to open for business. Rather, section 2.7 of the lease contemplated that, after delivery of the premises, both Slyce and Metro would work "at the Premises simultaneously," to prepare it for operation as a restaurant. Moreover, as noted by the trial court, the evidence did not suggest that Metro ever prevented Slyce or its agents from accessing the premises.

¶ 142   We also reject Slyce's suggestion that Metro materially breached the lease because it failed to complete the "Landlord's Work" set forth in exhibit D. As Metro notes, Slyce does not specify which items on exhibit D were not completed. In any event, even if Metro did not complete "Landlord's Work," it would not excuse Slyce's nonperformance under the lease. This is made clear by examination of the language of section 2.7. Under that provision, Metro was required to complete Landlord's Work "promptly, but in any event, no more than ten (10) days after Tenant completes Tenant's Work." That is, Metro was not obligated to complete its work until *after* Slyce

completed "Tenant's Work." And there is no dispute that Slyce did not, in fact, complete "Tenant's Work" before it ceased paying rent and abandoned the project.[6]

¶ 143        The Floor Replacement Work Was Not a Material Breach by Metro

¶ 144   Slyce separately argues Metro materially breached the lease because Metro was responsible for replacing the floor and the ensuing delays. Slyce argues that Metro's conduct shows it undertook responsibility for that work. Slyce points out that Metro had the specifications for the ovens in 2018 but "waited until March 2019 to make the decision to replace the floor." Slyce asserts it could not make progress on "Tenant's Work" until the ovens were installed, which was prevented by Metro's delays in the floor replacement work.

¶ 145   In making this argument, Slyce disputes a number of the trial court's key factual findings. At trial, the court found that Slyce was responsible to determine how to bring the ovens into the building, and it criticized Slyce for not having a feasible plan to bring the ovens into the building across the wood floor. The trial court found that Metro worked diligently to move the project forward, once it determined the floor replacement was necessary. We cannot say the trial court's findings were against the manifest weight of the evidence.

¶ 146   Notably, there is no dispute that the floor replacement was *not* specifically identified as part of "Tenant's Work" in exhibit C or "Landlord's Work" in exhibit D to the lease. This is not surprising, since the trial evidence was that the parties did not consider replacing the floor until *after* the lease was executed, once they realized the existing wood floor would not support the 6,500-pound ovens. It is true that the ovens' specifications were made known to Metro in 2018. However, trial testimony indicated it was not until late February 2019 that Slyce disclosed its wish

---

[6]Indeed, as pointed out at trial, under section 2.7, Slyce had up to six months following the January 31, 2019, commencement date to complete "Tenant's Work." Yet Slyce had already abandoned the project before that six-month period had elapsed.

to move the ovens in through the front of the building, after which Dragan calculated that the existing floor was not strong enough to support the load. Thus, as pointed out at oral argument, Slyce's complaint that Metro "waited" until March 2019 to begin the floor reinforcement is a distortion of the record.

¶ 147 Both parties acknowledge that Metro took the lead in the work of the floor replacement. Yet we disagree with Slyce's suggestion that the resulting delay constituted a material breach by Metro. Although the project was delayed by the floor work, this did not necessarily mean that Metro breached the lease, let alone that it defeated the "benefit of the bargain." Indeed, the trial court could reasonably find that Metro worked diligently to address the issue after it was identified and frequently updated Slyce. That finding was supported by the evidence, including numerous e-mails and Jim's testimony, which the trial court was entitled to find credible.

¶ 148 Furthermore, the evidence indicated that the floor replacement work was actually getting done (albeit more slowly than Slyce desired), such that the restaurant could, in fact, have opened if Slyce had not abandoned the project. Metro obtained permits for the steel and concrete work, and the concrete was poured in late June 2019. Although Slyce wanted the restaurant to be open earlier, the lease did not set forth any particular opening date as a precondition for Slyce's performance.

¶ 149 The lease required both parties to use their "best efforts to jointly coordinate" work to prepare the premises. The court found that Metro did undertake such efforts. The trial court could reasonably find that, under these circumstances, any delay occasioned by the floor replacement work was not a breach by Metro, let alone a material breach.

¶ 150        Other Delays in Landlord's Work Were Not a Material Breach

¶ 151   Apart from delays caused by the floor replacement, Slyce argues that Metro otherwise committed a material breach in failing to use its best efforts to complete "Landlord's Work" promptly. Slyce suggests Metro acted in a "dilatory manner" with respect to "seeking permits from the City, finishing the rough work, and clearing construction debris." Slyce cites Altmann's testimony that there was no change in the condition of the site when he visited in February, March, and April 2019.

¶ 152   This claim of material breach is unavailing, as there is scant evidence in the trial record suggesting that any such delays were so egregious that they could justify a belief that " 'the whole transaction [was] at an end,' " to excuse Slyce of its lease obligations. See *InsureOne*, 2012 IL App (1st) 092385, ¶ 43 (quoting *Village of Fox Lake v. Aetna Casualty & Surety Co.*, 178 Ill. App. 3d 887, 901 (1989)). The trial court could reasonably find that Altmann's testimony was unhelpful to Slyce on this point. Altmann admitted he was not familiar with the lease, he was not familiar with the permitted plans, and he never did any work at the premises. Thus, it is hard to see how Altmann's testimony could help establish whether Metro failed to comply with its lease obligations. Perhaps more important, the lease contemplated that the Landlord's Work could be completed up to 10 days *after* Tenant's Work. As Tenant's Work was never completed, Slyce cannot rely on a delay in Landlord's Work as a material breach.

¶ 153   For similar reasons, we reject Slyce's contention that a material breach could be premised on Metro's failure to "complete the carpentry work, as set forth on Plans, within 30 days after approval of Plans by City of Des Plaines," as called for under section 2.7 of the lease. This claim was not made at trial and is thus forfeited. *Jameson Real Estate, LLC*, 2018 IL App (1st) 171534, ¶ 75. In any event, there was no trial testimony suggesting that Metro's failure to complete carpentry work within 30 days was serious enough to constitute a material breach.

¶ 154 We reach a similar conclusion with respect to Slyce's claims that a material breach should have been found based on Metro creating a "large hole in the Premises" that prevented Slyce from performing work. Slyce refers to the language in section 2.7 that Metro shall deliver the premises in a condition "no materially worse than the condition of the Premises on the Execution Date."[7] Slyce then faults Metro for creating a large hole that "expos[ed] anyone walking near it to a fall" and for creating a hazardous condition by failing to remove construction debris. This specific claim was not argued to the trial court, and it is otherwise without merit for multiple reasons. First, the undisputed evidence was that Metro created the "hole" due to Slyce's decision to bring the ovens through the front of the building. Moreover, there was little if any evidence at trial suggesting the floor replacement prevented Slyce from doing *any* of its work, such that it could be construed as a material breach that excused its obligations under the lease. At most, Altmann testified to his belief that, based on his visits to the property in February, March, and April 2019, the area of the floor replacement work was dangerous. But Slyce presented no testimony from any contractor regarding the site conditions in May or June 2019. There was certainly no testimony suggesting that Metro made the premises so dangerous such that Slyce should have considered the " 'whole transaction at an end.' " *InsureOne*, 2012 IL App (1st) 092385, ¶ 43 (quoting *Village of Fox Lake*, 178 Ill. App. 3d at 901).

¶ 155 The Trial Court Reasonably Found that Metro Used Its

Best Efforts to Coordinate Its Work

¶ 156 Slyce's final claimed basis for alleging a material breach is that Metro failed to use its "best efforts to jointly coordinate" its work with Slyce to minimize delays, as required by section 2.7 of

---

[7]Slyce did not make an argument based on this lease provision at trial, and so Slyce's reliance on it is forfeited. *Jameson Real Estate, LLC*, 2018 IL App (1st) 171534, ¶ 75.

the lease. Citing e-mails discussed at trial, Slyce claims that Metro failed to communicate the progress of the floor replacement work. But the trial court's remarks show that it considered the pertinent evidence and rejected this claim. The court found that Metro made diligent efforts to coordinate with Slyce, crediting Jim's testimony that he frequently communicated with Brittany about the status of the project in calls or meetings. The trial court was entitled to find Jim credible, especially as a number of the referenced meetings were corroborated by e-mails or other witness testimony. As the trial court reasonably found that Metro met its obligations under section 2.7, we reject this material breach claim.

¶ 157        Slyce's "Quiet Enjoyment" and "Wrongful Prevention" Claims Fail

¶ 158   Slyce separately asserts that it should not be liable for its breach of contract, because Metro breached "the covenant of quiet enjoyment" of the leased premises because it "fail[ed] to allow Slyce to use the Premises for its stated purpose" as a functioning restaurant. This argument was not presented to the trial court and is thus forfeited. *Jameson Real Estate, LLC*, 2018 IL App (1st) 171534, ¶ 75. In any event, the trial court found that Metro made diligent efforts to move the floor replacement project forward in an effort to prepare the restaurant for opening. That finding was not against the manifest weight of the evidence, and so Slyce's "quiet enjoyment" argument fails.

¶ 159   Slyce makes a similar claim that, under the "wrongful prevention doctrine," Metro should not prevail because it prevented Slyce's performance of "Tenant's Work." The " 'wrongful prevention doctrine' is in the nature of an estoppel because it prohibits a party from profiting through his own wrongdoing." See *Cummings v. Beaton & Associates, Inc.*, 249 Ill. App. 3d 287, 307 (1992). If one party directly causes a contractual condition to fail, "the contract may be fully enforced against that party; one cannot take advantage of his own conduct and then claim that the resulting failure of the condition defeats his liability. [Citation.]" *Id.* at 306. This argument was

not presented to the trial court and is thus forfeited. In any event, the trial court's remarks made clear that it did not find that Metro engaged in any wrongful conduct but in fact Metro made good-faith efforts to complete the work before Slyce abandoned the project. This finding was not against the manifest weight of the evidence, and so the "wrongful prevention" claim is without merit.

¶ 160          The Trial Court Did Not Err in Finding No Constructive Eviction

¶ 161   We turn to Slyce's contention that there was a constructive eviction in this case, which relieved it of the obligation to pay rent. Slyce asserts Metro's acts and omissions made it "unable to use the premises for its intended purpose, the operation of a restaurant."

¶ 162   Constructive eviction requires something of a "serious and substantial character done by the landlord with the intention of depriving the tenant of the enjoyment of the premises." *Shaker & Associates, Inc. v. Medical Technologies Group, Ltd.*, 315 Ill. App. 3d 126, 134 (2000). Our court has also used the phrase " 'grave and permanent character' " in describing the requisite conduct by the landlord. See, *e.g.*, *Home Rentals Corp. v. Curtis*, 236 Ill. App. 3d 994, 998 (1992) (quoting *Applegate v. Inland Real Estate Corp.*, 109 Ill. App. 3d 986, 989 (1982)). There need not be an express intention on the part of the landlord to so deprive the tenant. *Shaker & Associates, Inc.*, 315 Ill. App. 3d at 134. Constructive eviction relieves the tenant from the obligation to pay rent after the tenant quits the premises. *Id.* at 134-35.

¶ 163   Whether there has been a constructive eviction is a question of fact that will not be reversed unless it is against the manifest weight of the evidence. *Home Rentals Corp.*, 236 Ill. App. 3d at 998. Here, the trial court found no constructive eviction; that finding was not against the manifest weight of the evidence. As discussed, the trial court found that Metro worked diligently to complete the floor replacement project to facilitate the installation of Slyce's ovens. Although Slyce hoped and expected that the project would be completed earlier, the fact that it was not done

by June 2019 did not violate the lease. Under these facts, the court reasonably declined to find conduct of a "grave and permanent character" that would constitute a constructive eviction.

¶ 164                                        Impracticability and Commercial Frustration

¶ 165   We also reject Slyce's assertions that it should not be liable for its breach, under either the doctrine of commercial impracticability or commercial frustration. Once again, these arguments were not made to the trial court and are forfeited. In any case, the record does not support application of either doctrine.

¶ 166   Where a party's performance under a contract " 'is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.' " *55 Jackson Acquisition, LLC v. Roti Restaurants, LLC*, 2022 IL App (1st) 210138, ¶ 55 (quoting Restatement (Second) of Contracts § 261 (1981)). However, "[a] party is expected to make reasonable efforts to surmount obstacles to performance, and performance is excused only if it is impracticable despite reasonable efforts." *Id.* Slyce suggests that the parties assumed the restaurant would be open by May 2019, such that the delay from the floor work excused it from performing under the lease. That suggestion is belied by the fact that the lease did not specify any opening date. In any event, Slyce would still need to make "reasonable efforts" to overcome the obstacle to the desired opening date. The trial court's remarks reflect that it did *not* find Slyce made reasonable efforts to work with Metro. That finding was not against the manifest weight of the evidence.

¶ 167   Under the commercial frustration doctrine, a contract is unenforceable if a party's performance is "rendered meaningless due to an unforeseen change in circumstances." See *Illinois-American Water Co. v. City of Peoria*, 332 Ill. App. 3d 1098, 1106 (2002). A party asserting this

defense must show that (1) the frustrating event was not reasonably foreseeable and (2) the value of performance by the nonclaiming party has been totally or nearly totally destroyed by the frustrating event. *55 Jackson Acquisition, LLC*, 2022 IL App (1st) 210138, ¶ 56. Slyce cannot show both elements. Even if the floor replacement work was not reasonably foreseeable, we cannot say that the resulting delay destroyed the value of Metro's performance under the lease. While the floor reinforcement work certainly delayed the project, the evidence was that Metro eventually completed the work, with the concrete being poured in late June 2019. Keeping in mind that the lease had a term of 10 years and one month, it cannot be said that a delay of a few months would nearly or totally destroy the value of the lease.

¶ 168    In sum, we reject all of Slyce's arguments that it should not be held liable for its admitted breach of contract. We affirm the trial court's finding that Slyce was liable for breach of the lease under Metro's counterclaim.[8]

¶ 169                                     Damages

¶ 170    We turn to Slyce's challenges to various portions of the court's damage award set forth in its April 2022 order. Slyce challenges (1) the award of "lump sum liquidated damages" of $327,626.48; (2) the $365,255.76 award for past rent, utilities, and taxes; (3) the $111,910.38 award for construction costs; and (4) the $28,000 award for brokerage fees. We find these challenges without merit, except with respect to the brokerage fees.

¶ 171    In reviewing a damage award following a bench trial, the standard of review is whether the trial court's judgment is against the manifest weight of the evidence. *2460-68 Clark, LLC v. Chopo Chicken, LLC*, 2022 IL App (1st) 210119, ¶ 28. Against the manifest weight of the evidence

---

[8]Insofar as the trial court found that Laurie and Brittany were also liable to Metro pursuant to the guaranty they signed, no distinct challenge to their liability under the guaranty has been raised in this appeal.

means "the opposite conclusion is clear" or the trial court's findings "appear to be unreasonable, arbitrary, or not based on evidence." *Id.*

¶ 172        Slyce's Challenges to the Liquidated Damages Award Are Without Merit

¶ 173   Slyce challenges the $327,626.48 award of liquidated damages, pursuant to the lease's "lump sum liquidated damages" clause in section 13.2. Slyce suggests the trial court was prohibited from awarding any liquidated damages whatsoever, because it awarded other amounts for actual damages. Slyce otherwise claims that the liquidated damages provision at issue was unenforceable and constituted a penalty. Many of these arguments were not raised below and are forfeited. In any event, we find them unavailing.

¶ 174   "When interpreting contract provisions that specify damages, Illinois courts draw a distinction between liquidated damages, which are enforceable, and penalties, which are not." *GK Development, Inc. v. Iowa Malls Financing Corp.*, 2013 IL App (1st) 112802, ¶ 47.

> "The general rule of contracts that a plaintiff is only entitled to recover damages to the extent of his injury is applicable to cases of a breach of a lease. [Citation.] Where damages are difficult to ascertain, the parties may specify a particular sum as liquidated damages. [Citation.] However, if the clause fixing damages is merely to secure performance of the agreement, it will be treated as a penalty and only actual damages proved can be recovered." *Stride v. 120 West Madison Building Corp.*, 132 Ill. App. 3d 601, 605 (1985).

¶ 175   In assessing whether such a clause is enforceable, this court has held:

> " 'Damages for beach by either party may be liquidated in the
> agreement but only at an amount that is reasonable in the light of the
> anticipated or actual loss caused by the breach and the difficulties of

proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.' " *Penske Truck Leasing Co. v. Chemetco, Inc.*, 311 Ill. App. 3d 447, 454 (2000) (quoting Restatement (Second) of Contracts § 356 (1981)).

¶ 176 This court has identified three elements that must be met to enforce a liquidated damages clause:

"(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained, and (3) actual damages would be uncertain in amount and difficult to prove." *GK Development, Inc.*, 2013 IL App (1st) 112802, ¶ 49.

"Whether a contractual provision for damages is a valid liquidated-damages provision or a penalty clause is a question of law." *Penske Truck Leasing*, 311 Ill. App. 3d at 454.

¶ 177 In this case, the lease provided that, upon a default, Slyce must pay to Metro "[a]t Landlord's option *** such expenses as Landlord may incur in connection with the Event of Default *** and all reletting, plus either (a) Lump-Sum Liquidated Damages or (b) *** monthly liquidated damages." The court ultimately awarded "Lump Sum Liquidated Damages," the calculation of which was set forth in section 13.2 as

"the difference between: the sum of the annual Fixed Minimum Rent, the Tax Rent payable in the year immediately preceding such termination, and Utility Charges payable in the last preceding Adjustment Year, all multiplied by the number of years and fraction of a year then constituting the unexpired Term, discounted at the rate

of four percent (4%) per annum to present worth, minus the fair and reasonable annual rental value of the Premises for such period, also discounted at the rate of four percent (4%) per annum to present worth."

¶ 178   Section 13.2 also stated:

"If the Premises or any part thereof be relet by Landlord for the balance of the Term or any part thereof prior to presentation of proof of such liquidated damage to any court *** the amount of rent reserved upon such reletting shall be deemed *prima facie* to be the fair and reasonable rental value."

In this case, the premises had not been relet at the time of trial.

¶ 179   We find that section 13.2 was enforceable. Its formula for "Lump Sum Liquidated Damages" reflected a reasonable estimate of damages that Metro would sustain from lost future rent in the event Slyce breached the lease, as such damages would be uncertain and difficult to prove. In other words, we decline to find that this clause was an unenforceable penalty.

¶ 180   In so doing, we reject Slyce's contention that section 13.2 violates a rule that a party "cannot recover both liquidated damages and actual damages." Slyce directs our attention to a decision invalidating a $10,000 liquidated damages award, where the applicable contract specified that this amount was "recoverable in addition to 'any and all actual damages' resulting from breach." *H&M Driver Leasing Services, Unlimited, Inc. v. Champion International Corp.*, 181 Ill. App. 3d 28, 31 (1989). In that case, this court determined that the liquidated damages clause imposed a penalty, reciting the principle that, "[w]here a contract provides that the breaching party must pay all damages caused by the breach *as well as a specific sum in addition thereto*, the sum

so specified can be nothing but security for performance and, therefore, constitutes an unenforceable penalty. [Citation.]" (Emphasis added). *Id.*

¶ 181   The calculation of damages in this case does not resemble the fixed $10,000 sum deemed a penalty in *H&M Driver Leasing Services.* The "Lump Sum Liquidated Damages" provision in section 13.2 does not set forth a *specific* sum but instead provides a formula to estimate the landlord's damages with respect to lost future rent stemming from the tenant's breach of the lease. We find this is a reasonable estimate of damages that is enforceable.

¶ 182   On this point, we find instructive *Penske Truck Leasing*, 311 Ill. App. 3d 447, which enforced a liquidated damages provision containing a "formula" to estimate damages from a breach. The plaintiff in *Penske* leased trucks to a customer who defaulted on the lease. *Id.* at 448-49. The lease agreement provided that, in the event of default, the plaintiff could sell the vehicles and apply the proceeds to the customer's obligations or that the plaintiff had the option to retain the vehicles. *Id.* at 450. If the plaintiff retained the vehicles, the customer would be credited for their fair market value:

> " 'The Net Fair Market Value of the Vehicle shall be applied to
> CUSTOMER's obligations *** and CUSTOMER shall remain
> liable for any sums due to PENSKE TRUCK LEASING under this
> lease or otherwise. All amounts to be retained by PENSKE TRUCK
> LEASING and any balance to be paid by CUSTOMER under this
> lease shall not be construed as a penalty, but as liquidated damages
> for the breach of this lease ***.' " *Id.* at 450-51.

¶ 183   This court agreed with the plaintiff's argument that this was an enforceable liquidated damages provision

"because it provides for an amount of damages that is reasonable in light of the anticipated harm. The lease provides for a formula, as opposed to a specific amount, which begins with an agreed-upon original amount and takes into consideration the amount of depreciation of the trucks before they are returned \*\*\*." *Id.* at 454.

The *Penske* decision emphasized that "the agreement does not set forth a sum certain in case of a breach by the customer, but it provides a formula for computing damages in case of a breach." *Id.* at 455.

¶ 184    The "Lump Sum Liquidated Damages" formula at issue in section 13.2 of the lease is analogous to that approved by the *Penske* court. Section 13.2 contemplates an award of the remaining rent under the lease term, "discounted at the rate of four percent" to present worth, "minus the fair and reasonable rental value of the Premises for such period," also discounted to present value. In effect, this attempts to compensate the landlord (Metro) by awarding the difference between the remaining rent due under the lease and the "fair and reasonable rental value of the Premises." Use of such a formula is appropriate when, at the time of contracting, it is difficult to predict the damages that will result from breach. See *id.* at 455-56 ("[I]t was difficult to determine plaintiff's losses with regard to a breach of the agreement at the time the agreement was entered by the parties because the used truck market is difficult to predict in advance. Under these circumstances, the alternative formulas provided for in the agreement appear reasonable.") Certainly, the real estate market is difficult to predict, so the parties could determine that use of this formula was appropriate to estimate damages from a breach of the lease.

¶ 185    We emphasize that the "Lump Sum Liquidated Damages" formula takes into account that Metro still has the "fair and reasonable rental value of the Premises." That is, the fair rental value of the premises is subtracted from the damage calculation. This differentiates this provision from

one that demands payment of *all* remaining rent for the remainder of the lease term, without accounting for the landlord's ability to relet the premises; such a clause is a penalty. *2336 North Clark, LLC v. Hair Fairies, Inc.*, 2022 IL App (1st) 211597-U (declining to enforce accelerated rent clause that would award landlord 27 months of future rent as liquidated damages).

¶ 186   At this point, we note Slyce's objection that the "Lump Sum Liquidated Damages" provision fails to specify the "fair and reasonable annual rental value of the Premises." We find this objection unconvincing. Given the inherently unpredictable nature of real estate valuations and the 10-year length of the lease, it is hardly surprising that no number is specified. Moreover, section 13.2 contemplates that a court may determine fair value upon "presentation of proof of such liquidated damages" and that, if Metro has relet the premises to another party, "the amount of rent reserved upon such reletting shall be deemed *prima facie* to be the fair and reasonable rental value." In this case, Jim testified to Metro's calculation of the fair and reasonable annual rental value of the premises. Notably, Slyce could have but did not present any conflicting evidence on that point.

¶ 187   Slyce's remaining challenges to the liquidated damages award were not raised below and, in any event, are without merit. Emphasizing the use of the word "option," Slyce attacks the language in section 14.5 that, in the event of default, Slyce shall:

> "pay Landlord, at Landlord's option *** such expenses as Landlord may incur in connection with the Event of Default *** and all reletting *** plus either (a) Lump-Sum Liquidated Damages or (b) as liquidated damages *** for each month of the period which would otherwise have constituted the balance of the Term, the excess, if any, of monthly liquidated damages ('*Monthly Liquidated*

*Damages*') equal to the sum of the then-applicable monthly installment of Fixed Minimum Rent, plus the monthly portion of the payment of Tax Rent that would have been payable for the period in question *** plus Utility Charges payable for such month *** over the net amount, if any, of the rents actually collected on account of the lease or leases of the Premises for such month." (Emphasis in original.)

¶ 188    Slyce cites two cases for the proposition that "optional liquidated damages provisions are unenforceable," but neither is on point. In *Grossinger Motorcorp, Inc. v. American National Bank & Trust Co.*, 240 Ill. App. 3d 737, 740 (1992), this court invalidated a provision in a real estate sale contract that " 'the earnest money shall be forfeited to the [defendant] to be retained by the [defendant] as liquidated damages, or at [defendant]'s option, [defendant] may exercise any other remedy available at law,' " reasoning that " 'the option reflects that the parties did not have the mutual intention to stipulate to a fixed amount' " but "indicates 'an intent to penalize the defaulting buyer.' " *Id.* at 750-51 (quoting *Lefemine v. Baron*, 573 So. 2d 326, 329 (Fla. 1991)). Several years later, this court invalidated another provision that purported to give a real estate seller the "option" to retain earnest money as liquidated damages. *Catholic Charities of the Archdiocese of Chicago v. Thorpe*, 318 Ill. App. 3d 304, 312-13 (2000). The clause at issue in this case does not resemble the earnest money clauses in the two cited cases. Rather, the "option" in section 14.5 pertains to the landlord's ability to elect between different formulas for "Lump Sum Liquidated Damages" or "Monthly Liquidated Damages." Slyce does not cite any authority suggesting this is impermissible.

¶ 189 We also reject Slyce's contention that the trial court improperly found the liquidated damages provision valid based on "Metro's inability to relet the Premises through the time of trial." Slyce argues the trial court improperly considered events after execution of the contract to determine its validity. This contention is unavailing. Regardless of the trial court's stated reasoning, we have reviewed the relevant contract provision *de novo* and concluded that it is enforceable.

¶ 190 For the foregoing reasons, we reject Slyce's challenges to the enforceability of the liquidated damages provisions of the lease. As to the specific *amount* of the corresponding award of $327,626.48, we note that Slyce does not take issue with Jim's uncontradicted trial testimony regarding Metro's calculation of "Lump Sum Liquidated Damages" under section 13.2. Thus, we have no reason to disturb the amount of this award.

¶ 191      The $365,255.76 Award for Rent, Taxes, and Utilities Was Not Erroneous

¶ 192 In challenging the award of $365,255.76 for rent, taxes, and utilities, Slyce asserts a number of grounds that it never presented to the trial court. Referencing language found in section 3.6 of the lease, Slyce claims it was not liable for taxes "until Slyce obtained a certificate of occupancy or sixty days after delivery of the Premises and substantial completion of Metro's work," neither of which occurred. Slyce never argued this before the trial court. Indeed, as Metro points out, Slyce's posttrial memorandum acknowledged that the trial court had "discretion to consider a fair and equitable amount of an award *** for rent, taxes and utilities." Moreover, Slyce does not cite any record evidence to establish that the conditions in section 3.6 occurred. Thus, we have no basis to disturb this aspect of the damage award.

¶ 193 Slyce similarly argues (for the first time) that Metro was not entitled to recover damages for utility costs, because Metro never "tendered possession of the Premises to Slyce." Slyce refers

to section 5 of the lease, which states that, "after the date on which Landlord tenders possession of the Premises to Tenant, Tenant shall pay for all utility service provided to the Premises." Once again, this argument was never brought to the trial court's attention and is forfeited. Moreover, Slyce does not cite any evidence establishing that it never took "possession" of the premises.

¶ 194   Slyce also suggests that the award for unpaid rent should be reduced because "Metro failed to discount the rent for the reasonable rental value during that time period." This argument is forfeited and also plainly without merit, as there was undisputed testimony that Metro had not yet been able to rent the premises as of the time of the April 2022 trial. Slyce also asserts that the award for unpaid rent should be reduced because this period overlapped with the COVID-19 pandemic. Perhaps this argument could have been made to the trial court, but Slyce cites no evidence or authority to support a reduction on this basis. Slyce has not demonstrated that the $365,255.76 award was against the manifest weight of the evidence, and thus we affirm it.

¶ 195                    The Construction Expenses Award Was Not Erroneous

¶ 196   Slyce further contends that it should not be liable for any of the $111,910.38 awarded for Metro's construction expenses because the lease stated that Landlord's Work would be at "Landlord's Expense." Slyce also disputes the trial court's finding that these expenses were related to Slyce's breach. These contentions are forfeited and in any event are without merit. Section 14.5 of the lease states that Slyce shall pay "such expenses as Landlord may incur in connection with the Event of Default." At trial, Jim testified that Metro incurred the expenses at issue to accommodate Slyce's custom requirements and that the floor replacement work was necessitated by Slyce's decision to bring the ovens through the front. These expenses directly related to Metro's lease with Slyce. " '[A]ll damages which naturally and generally result from a breach are recoverable.' " See *InsureOne*, 2012 IL App (1st) 092385, ¶ 89 (quoting *Midland Hotel Corp. v.*

*Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 318 (1987)). The trial court could reasonably conclude that Metro's lost construction expenses constituted compensable damages for Slyce's breach.

¶ 197                    The $28,000 Award for Broker's Fees Was Speculative

¶ 198   Slyce separately challenges the court's award of $28,000 for Metro's expected brokerage fees, as they were a "speculative" estimate of the fees Metro would pay if and when its broker found a new tenant for the premises. We find this argument persuasive.

¶ 199    A plaintiff is not entitled to recover damages that are "remote, speculative, or uncertain"; a plaintiff "must establish an actual loss with measurable damages in order to recover." *Union Tank Car Co. v. NuDevco Partners Holdings, LLC*, 2019 IL App (1st) 172858, ¶ 27. "Absolute certainty" with respect to the amount of damages is not required. *Id.* "Rather, so long as the existence of damages is certain, a plaintiff need not necessarily establish the precise amount of damages." *Id.*

¶ 200   Section 14.5 of the lease specifies that Slyce shall pay Metro's expenses incurred in connection with reletting the premises after a default, including "brokerage, and management fees and commissions." However, as of the time of trial, Metro had not paid such fees because it had not yet found a new tenant for the premises.

¶ 201   At trial, Jim testified about Metro's efforts to find a new tenant and how it arrived at its $28,000 figure for its expected brokerage fees. Jim testified that Metro had an agreement with a broker calling for a 4% brokerage fee. Metro "estimated $700,000" for remaining rent under the lease period, "times the 4 percent, gets us to $28,000 for the brokerage commission." Thus, the $28,000 figure is based on Metro's estimate that it will obtain $700,000 in rent for the remainder of the lease period. However, we think it is speculative as to whether Metro will be able to get that amount. Notably, Jim testified that Metro had significant difficulties in attempts to find another

tenant willing to rent the premises, which remained vacant at the time of trial.[9] And as Metro acknowledges in its brief, "rental markets for commercial real estate are highly variable." This suggests that (1) Metro may not be able to find a tenant for an unknown period of time and (2) to relet the space, Metro may be forced to accept significantly less rent than it previously expected. In turn, we find Metro's estimate of $700,000 in remaining rent is speculative, as is the estimated corresponding 4% broker's fee of $28,000. For this reason, we reverse the portion of the court's order that awarded damages for $28,000 in broker's fees. We otherwise affirm the trial court's damage awards.

¶ 202                    An Evidentiary Hearing Is Proper to Determine Appropriate

Attorney Fees and Costs

¶ 203   We turn to Slyce's challenges to the trial court's separate award of $187,413.75 in fees and $14,621.23 in costs. The court awarded the full amount requested by Metro, after declining Slyce's request for an evidentiary hearing.

¶ 204   The lease expressly contemplated the recovery of Metro's attorney fees. Nonetheless, Slyce asserts the court erred in declining to hold an evidentiary hearing. Slyce otherwise raises a number of challenges to the amount of the fee award, claiming a number of defects in the time entries submitted with the fee petition. Slyce also claims that the award included certain nonreimbursable fees, such as those incurred by Metro's real estate attorney. Slyce further suggests the trial court improperly relied on Slyce's failure to settle the matter in awarding Metro all of its requested fees and costs.

¶ 205   We need not discuss each of these contentions in detail, as we find the circumstances warranted an evidentiary hearing on the amount of attorney fees and costs.

---

[9]The premises remained vacant for at least another year, as Metro's brief (filed July 2023) represents that it remained unrented.

¶ 206    "The party seeking fees bears the burden of presenting sufficient evidence to support a determination that the fees sought are reasonable." *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 102. In determining whether the fees sought are reasonable, courts consider a number of factors, including

> "the skill and standing of the attorneys, the nature of the case, the novelty and/or difficulty of the issue and work involved, the importance of the matter, the degree of responsibility required, the usual and customary charges for comparable services, the benefit to the client [citation], and whether there is a reasonable connection between the fees and the amount involved in the litigation." (Internal quotation marks omitted.) *Id.*

Generally, a trial court's award of attorney fees and costs is reviewed under the abuse of discretion standard. *Id.* ¶ 105.

¶ 207    Before reviewing the amount of the award, a threshold inquiry is whether the court should have first held an evidentiary hearing. In 2007, this court recognized there was a "conflict of authority" as to whether an evidentiary hearing is required before making an attorney fee award but concluded that the "general rule [was] that an evidentiary hearing should be held." *Trossman v. Philipsborn*, 373 Ill. App. 3d 1020, 1056 (2007). *Trossman* reasoned:

> "[G]enerally, in protracted litigation involving multiple complex issues, an evidentiary hearing should be conducted upon the request of the losing party, especially if the prevailing party was represented by multiple attorneys—which may have resulted in duplicative charges—and where the prevailing party was entitled to fees and costs with respect to some claims, but not others." *Id.* at 1058.

¶ 208    This court subsequently held that "a fee petition warrants an evidentiary hearing only when the response of the party to be charged with paying the award raises issues of fact that cannot be resolved without further evidence." *Young*, 2015 IL App (1st) 131887, ¶ 113. This court subsequently indicated (albeit in *dicta*) that a party who requests such a hearing should get one in order to be able to exercise its right of cross-examination:

> " 'The reasonableness of fees is a matter of proof, and a party ordered to pay attorney fees has the right to conduct meaningful cross-examination on the issue.' [Citation.] 'When a party who must pay attorney fees asks for an evidentiary hearing, he is entitled to one. [Citation.]' " *U.S. Bank National Ass'n v. Randhurst Crossing LLC*, 2018 IL App (1st) 170348, ¶ 83.

¶ 209    After reviewing Slyce's objections to the fee petition, we believe Slyce raised sufficient factual issues to warrant a hearing. Among these, Slyce identified numerous billing entries that it believed were vague or duplicative and entries that allegedly billed attorney time for clerical or administrative tasks. The trial court did not specifically address any of these objections. Further, the court's order awarded all fees incurred by Metro's real estate counsel (Bazianos), without addressing Slyce's contentions that it was improper to award fees incurred before the litigation or to reimburse legal fees stemming from Metro's unsuccessful efforts to relet the premises.[10]

---

[10]For example, Metro submitted invoices from Bazianos for prelitigation work pertaining to preparation of the lease. Metro also sought reimbursement for real estate attorney fees incurred in efforts to relet the premises to a new tenant. For example, Metro submitted Bazianos invoices from October 2021, November 2021, and February 2022 whose entries appear to reference another potential tenant and lease. Metro's submission also includes a February 2021 invoice of $147.50 from Bazianos for a "Conference call with Clients regarding NDA and Employment Agreement" that has no apparent relevance to this litigation.

Without assuming whether these objections have merit, we think fairness warrants that Slyce be afforded an opportunity to conduct cross-examination on such matters.

¶ 210   We also find it notable that the trial court's November 2022 fee order adopted significant portions of language from Metro's fee petition, including criticism of Slyce for not settling despite "multiple opportunities" to do so. While we cannot know exactly what the court was thinking, this language arguably indicates that the decision to award *all* of Metro's requested fees was meant, at least in part, to punish Slyce for not settling. While the length and complexity of the litigation is certainly relevant to the reasonableness of the fees, we do not think it is appropriate to suggest that a larger award is appropriate to penalize a losing party for taking a case to trial that (in retrospect) it should have settled.

¶ 211   Because we find remand for an evidentiary hearing is appropriate, we need not further address Slyce's challenges to the contents of Metro's fee documentation or the reasonableness of such fees. Such arguments may be made on remand. To be clear, we do not mean to suggest that Slyce is necessarily entitled to any reduction. Our holding does not bar the trial court from again awarding the full amount of requested fees and costs. We merely determine that Slyce is entitled to an evidentiary hearing.

¶ 212                                    CONCLUSION

¶ 213   To summarize: (1) As to the trial court's findings on liability, we reject Slyce's claims of error and affirm the trial court's findings that Slyce was liable to Metro for breach of contract. In turn, Laurie and Brittany are also jointly liable as guarantors of the lease. (2) As to Slyce's challenges to the various damages awarded to Metro in the April 25, 2022, order, we affirm the damages awarded by the trial court, except that we reverse the portion awarding $28,000 for broker's fees. (3) Finally, insofar as Slyce appeals the November 16, 2022, award of Metro's

attorney fees and costs, we reverse and remand for the trial court to conduct an evidentiary hearing on the fee petition.

¶ 214    Affirmed in part and reversed in part; cause remanded with directions.

*Slyce Coal Fired Pizza Co. v. Metropolitan Square Plaza, LLC*, 2025 IL App (1st) 221279

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-L-8297; the Hon. Mary Colleen Roberts, Judge, presiding. |
| **Attorneys for Appellant:** | James K. Borcia, of Tressler LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Darrell J. Graham, Matthew D. Tanner, and Ashley J. Roeser, of Roeser Tanner & Graham LLC, of Chicago, for appellee. |