2025 IL App (1st) 242106-U

No. 1-24-2106

Order filed August 22, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| EFN CALUMET CITY PROPERTIES, LLC, an Illinois limited liability company, d/b/a Napleton Kia, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20 L 13861 |
| CITY OF CALUMET CITY, an Illinois municipal corporation, | ) ) ) | Honorable John J. Curry Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE NAVARRO delivered the judgment of the court.
Justices Oden Johnson and Mitchell concurred in the judgment.

¶ 1   *Held:*   The trial court's judgment finding in favor of plaintiff on plaintiff's breach of contract claim and its findings that the parties had a valid and enforceable contract and that plaintiff did not materially breach the contract are not against the manifest weight of the evidence; affirmed.

**ORDER**

¶ 2       Defendant-Appellant, City of Calumet City (City), appeals from the trial court's judgment finding in favor of Plaintiff-Appellee, EFN Calumet City Properties, LLC, an Illinois limited liability company, doing business as Napleton Kia (Napleton) and against the City on Napleton's breach of contract claim. On appeal, the City contends the trial court erred when it

found in favor of Napleton because the parties did not have a valid and enforceable contract. The City further argues that, even if the parties had a valid and enforceable contract, Napleton did not comply with the terms of the agreement, and the provision regarding the installation of the storm water detention facility was a material term. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Before 2010, Napleton operated a Honda dealership, in Calumet City, which it later moved to nearby Lansing, Illinois. Thereafter, in 2011, Napleton and the City entered into an economic incentive agreement for Napleton to operate a Kia dealership at that Calumet City location from 2011 through 2016. Under the agreement, the City would reimburse Napleton $100,000 each year in sales tax rebates, and Napleton would operate the Kia dealership at that location. In 2013, Kia required Napleton to complete renovations at the store, after which Napleton and the City negotiated an extension to the original agreement. On April 22, 2015, the City Council approved an amendment to the original agreement, which extended the agreement through 2021. In December 2020, Napleton filed a complaint against the City alleging one claim for breach of contract.

¶ 5                                      Complaint

¶ 6        In Napleton's complaint for breach of contract, it alleged as follows. Napleton operated a Kia automobile dealership at 1985 River Oaks Drive, Calumet City. In October 2011, the City adopted Ordinance No. 11-54, which approved an economic development agreement between the parties (original agreement). Under the original agreement, the City would pay Napleton a percentage of the sales tax generated by the Kia dealership from 2011 through 2016. During this time period, the City paid Napleton a sales tax rebate in an annual amount of $100,000. On April 22, 2015, the City adopted Ordinance No. 15-11(A), which approved an amendment to the original

agreement (first amendment) and extended the term of the original agreement by five years, from 2017 through 2021. The City allegedly did not make the annual payments owed to Napleton under the first amendment. The City's alleged failure to make the payments constituted a default and a material breach of the agreement.

¶ 7        Napleton attached to its complaint, among other documents, Ordinance No. 11-54, which approved the original agreement executed on October 4, 2011, and Ordinance No. 15-11(A), which approved the first amendment dated April 22, 2015. The original and first amendment agreements were also attached to the complaint.

¶ 8        The first amendment addressed the renovations that Napleton planned to make and stated that the City would "provide certain economic assistance in the form of sales tax rebates for half the amount of the estimated cost of the [r]enovations." The planned renovations included,

> "replacement of the entire existing façade of the Dealership Property with a new façade including a KIA signage package, realignment and increase in the number of sales consultation spaces, expansion of the showroom, refurnishing of the entire sales floor area, replacement and addition of lighting fixtures, replacement and addition of ceiling tiles, replacement of the roof and installation of underground storm water detention as depicted on Exhibit 1, attached hereto and incorporated herein subject to the approval of the City Engineer (collectively the 'Renovations')".

The first amendment stated that the estimated cost of the renovations was over $1 million.

¶ 9        The City alleged two affirmative defenses. In the first affirmative defense, the City alleged that Napleton failed to comply with the first amendment because it failed to timely provide proof of building permits, occupancy permits, and construction receipts confirming that the renovations had been completed.

¶ 10 In the City's second affirmative defense, it alleged that Napleton failed to perform the conditions set forth in the first amendment because it failed to make renovations having a value of about $1 million and failed to "complete the installation of underground storm water detention" required by the first amendment.

¶ 11 Trial

¶ 12 At the bench trial, the trial court admitted into evidence numerous exhibits, including the ordinances approving the original agreement and the first amendment as well as the agreements. The witnesses testified about the various provisions contained in the agreements.

¶ 13 Under the original agreement, from 2011 through 2016, the City paid Napleton an annual sum of $100,000 from sales tax generated to reimburse Napleton for its construction costs and expansion plans for the new Kia dealership. The parties do not dispute that the City paid Napleton the required payments under the original agreement.

¶ 14 The first amendment provided, in addition to the provision stated above regarding Napleton's planned renovations, that the parties agreed to add five additional years to the original term, from 2017 to 2021, and that Napleton would construct and develop the renovations pursuant to the first amendment and applicable City ordinances. The first amendment stated that the City agreed, "in reliance on and conditioned upon [Napleton] developing and constructing the Renovations on the Dealership Property and continuing to operate its existing [Kia] Dealership on the Dealership Property, to provide certain economic assistance in the form of sales tax rebates for half the amount of the estimated cost of the Renovations." The first amendment stated that the estimated cost for Napleton to complete the required renovations was over $1 million.

¶ 15 Richard Brandstatter, the director of real estate for Napleton, testified that in 2011, Napleton and the City entered into an agreement whereby from 2011 through 2016, Napleton

would operate a Kia dealership in Calumet City at the location at which it had previously operated a Honda dealership, and the City would pay Napleton $100,000 each year from the sales tax generated. The City paid Napleton $100,000 each year and would pay "in arrears, sometimes significantly in arrears." He identified Napleton's request for admission to the City, which was admitted into evidence, and he testified that the exhibit listed a series of payment dates for the tax years and that it accurately reflected when the City made its $100,000 payments under the 2011 agreement. The list of dates in the exhibit provided that the City paid Napleton the 2011 and 2012 sales tax rebate in October 2013, the 2013 payment in August 2014, the 2014 payment in July 2015, the 2015 payment in April 2016, and the 2016 payment in August 2017.

¶ 16    Brandstatter further testified as follows. At some point after 2011, Kia informed Napleton that it needed to upgrade the dealership to remain compliant with Kia's requirements. In 2013, Napleton met with representatives from the City regarding the improvements it needed to make and based on discussions that Napleton had with Burton Odelson, who was one of the City's attorneys during the relevant time, and Mayor Michelle Qualkinbush, who was the City's mayor, Napleton and the City reached an oral agreement, subject to City Council approval, by which the parties' agreement would extend for 5 more years, or until 2021, and the City would reimburse Napleton for 50% of the renovation costs in payments of $100,000 each year following the end of the original agreement.

¶ 17    Brandstatter testified about various communications Napleton had with the City relating to the first amendment. He identified an email he sent to Odelson in September 2013, to which he attached copies of the proposed improvements for the dealership, which included signage, roofing, and furniture but did not include a parking lot expansion or storm water detention facility. Brandstatter also identified an email he sent to Odelson in November 2013, in which he

asked, "how are we doing on extending the Incentive agreement for 5 years?" and stated, "I believe that our permit is about ready." He testified that he was looking for the City to prepare the document memorializing the oral agreement and that Napleton was proceeding to complete the work.

¶ 18    Brandstatter testified that in December 2013, he received an email from an attorney in Odelson's office, to which the attorney attached the 2011 original agreement and requested Brandstatter make suggested revisions. The next day, Brandstatter responded with a letter that reflected his understanding of the oral agreement, subject to approval, that the parties had reached in 2013. Brandstatter identified the letter as an exhibit and testified that one of the provisions in Brandstatter's letter contained a long list of renovations that Napleton planned. These renovations included replacing the entire existing façade with new signage, increasing the number of sales consultation spaces, expanding the showroom, refurnishing the entire sales floor area, replacing and adding lighting fixtures, replacing and adding ceiling tiles, and replacing the roof. Brandstatter testified that the list did not include the underground storm water detention or parking lot expansion, which had not been discussed at this point. The letter also included a provision providing that Napleton's estimated cost for the renovations exceeded $1 million. He testified that this estimated cost came from a preliminary estimate from contractors and that the work on the parking lot expansion would not have been part of that estimate. He also testified that the first amendment would extend the original agreement to five additional years, or until 2021. At the end of the letter, Brandstatter stated, "as you know I am not an attorney—I'm sure this could use more tweaking, but this is in essence what we're asking for."

¶ 19    Brandstatter testified that he attended a March 25, 2014, City Council meeting and that the minutes for that meeting showed that "[t]here was a brief discussion regarding the sales tax

sharing agreement for five years with Napleton Kia" and that it was recommended that the City's attorneys "prepare a sales tax sharing agreement for Napleton Kia for five years with the caveat that all construction be completed in the agreed time frame." As of March 2014, Brandstatter was expecting a written agreement from the City. In October 2014, Napleton did not have a written agreement representing the first amendment. At that time, it had spent $1 million on the renovations and "essentially completed the expansion of the showroom and all of the rest of the work" that Kia required. Brandstatter testified that in October 2014, representatives from the City, including the mayor, visited Napleton's property, during which Brandstatter told the City that the Napleton Kia dealership was out of parking space.

¶ 20    Brandstatter testified that, at some point, Napleton came up with the idea to expand its parking space by filling in a storm water detention area, which would require Napleton to pave over the existing detention area and install a storm water detention facility underneath. Brandstatter identified a memorandum from October 16, 2014, that he sent to the City's mayor's office, Odelson, and the economic development coordinator for the City after they toured Napleton's property. In this memorandum, Brandstatter thanked them for "devoting the time to meet with us at the sites we own and lease in Calumet City." Brandstatter also stated in the memo that Napleton "has completed the promised expansion and remodel of the Kia store—the lining of the pond with underground detention and filling and paving of the pond awaits the execution of the 5 year extension of the existing Economic Development Agreement" and "[m]y records indicate that this was approved on March 25, 2014."

¶ 21    Brandstatter testified that after speaking with engineers from the City as well as the Metropolitan Water Reclamation District (MWRD), about the underground storm water detention project, the MWRD informed Napleton that the project would require substantial upgrades, as

Napleton would need to bring the existing facility up to current standards and would also need to improve the detention area of its neighboring Hyundai dealership. The project would have required Napleton to rip up most of the paved area on both sites, install the underground storm water detention underneath, and then repave. Brandstatter testified that the project would not have been feasible from a cost or operations perspective, and it was "not an inexpensive project." Napleton's proposed underground storm water detention facility would not have provided a benefit to the nearby landowners. Napleton decided not to proceed with the project and advised the City of this plan. Brandstatter could not recall the date he notified the City that Napleton was not going to proceed and testified that Napleton told the City by March 2015 and "shortly after" its correspondence with the MWRD.

¶ 22    Brandstatter identified the minutes from two City Council meetings in November 2014, which showed that the City's mayor requested that the ordinance approving the first amendment be removed from the agendas for those meetings. Brandstatter identified an email from March 18, 2015, that the City's mayor sent to the City's attorneys and some other personnel from the City, and he agreed that it stated that the "first amendment for a Kia agreement was being handled by [Odelson's office] [a]nd [their] failure to create the document when the [City Council] approved it due to high cost of underground retention" and that Napleton "subsequently wanting to do something different with retention has complicated this issue moving forward." Brandstatter testified that at that time in March 2015, "[a]ll of the work was completely done," Napleton had spent the $1 million in renovations it was going to spend, and Napleton had notified the City that it was not going to proceed with the parking lot expansion. Asked whether he was nervous that the parties did not have a signed agreement at this time, he responded that he was "clearly nervous

8

about it, but we had previous dealings with Calumet City and they've been late in the past. So while being nervous, we felt that it would still get worked up."

¶ 23    Brandstatter testified that, at the April 22, 2015, City Council meeting, the City Council adopted the ordinance approving the first amendment. Brandstatter did not attend this meeting, he was not informed by anyone that the first amendment was on the agenda at this meeting, and the City did not show him a draft of the first amendment before this meeting. He identified as an exhibit the April 22, 2015, ordinance approving the first amendment and the first amendment attached thereto.

¶ 24    Brandstatter testified that the long list of renovations provided in the first amendment included the items that Napleton had discussed with the City in 2013, as well as the addition of "the installation of underground storm water detention as depicted on Exhibit 1, attached hereto and incorporated herein subject to the approval of the City Engineer." Brandstatter testified that there was no reference to storm water detention in the "Exhibit 1" attached to the first amendment. Napleton never provided the City with engineering plans related to any parking lot expansion or underground storm water detention and, by April 2015, Napleton had informed the City that it was not going to proceed with the project. At this time, all the renovations had been done with the exception of the storm water detention, and the renovations were done in reliance on the City's commitments. Brandstatter also testified that under the first amendment, the City agreed to pay Napleton "sales tax rebates for half the amount of the estimated cost of the renovations," with a limit of $500,000.

¶ 25    Brandstatter testified that, at some point after April 22, 2015, Napleton received a copy of the first amendment signed by the City, after which Napleton responded with a letter to the City on June 12, 2015, informing the City "that we weren't doing the detention, removed that, and sent

the cover letter back with a signed copy back to [the City]." Brandstatter identified a letter sent from Napleton's attorney to the City on June 12, 2015, which stated, "Please note that Exhibit A to the Ordinance was revised to remove reference to the stormwater detention as part of the renovations and to remove Exhibit 1." Attached to the letter was a version of the first amendment signed by Napleton that did not include the installation of the storm water detention in the list of renovations. Asked why Napleton removed the reference to the storm water detention and then sent it back, he testified that Napleton was not going to do to the storm water detention, the work was already completed at that time, and Napleton knew the cost exceeded $1 million. The City did not respond to Napleton's letter.

¶ 26     Brandstatter testified that between 2015 and 2018, Napleton continued doing business and, in September 2018, Napleton asked the City for the payment of the 2017 sales tax rebate. Brandstatter identified an email he received from Odelson in October 2018, which stated that, "We are in need of a fully executed copy of the First Amendment to the Agreement," which "dates back to 2015, and extends the agreement to 2021." Odelson also stated in the email, "Can you please execute the First Amendment where necessary and return to me asap." Attached to Odelson's email was the ordinance approving the first amendment and the first amendment dated April 22, 2015, which was signed by the City and included the installation of the storm water detention in the renovations. Thereafter, on October 30, 2018, Napleton signed the April 22, 2015, version of the first amendment. Asked why Napleton signed that version of the agreement, Brandstatter responded, "we wanted to get our money and we also knew that [the City] knew, at that point in time, we hadn't done the retention/detention, but that we had performed everything that we were going to do by 2015 prior to 2015." He testified that the April 22, 2015, version of the first

amendment signed by the City in 2015 and by Napleton in 2018 was the agreement Napleton was seeking to enforce.

¶ 27    Brandstatter testified that on October 19, 2018, Napleton submitted to the City its fixed asset ledgers showing what Napleton spent on the renovations. Thereafter, on November 9, 2018, in response to the City's request for Napleton to provide the actual invoices and payments, Brandstatter sent the City three different emails containing the checks, invoices, and remittance advice, which provided the details about the check, reflecting the monies spent. These documents were included in three different exhibits admitted into evidence. He explained that the Ed Napleton Dealership Group, which was the operating entity of Napleton, also owned dealerships in other locations and would issue checks to vendors covering multiple projects and locations. He explained that, in the records he sent to the City, each check issued by the Ed Napleton Dealership Group included all invoices associated with that check as well as the remittance advice. After Napleton sent the City the records, the City did not remit payment.

¶ 28    Brandstatter testified that on December 30, 2018, Odelson informed Brandstatter that he had "asked the City to remit payment." Between November 2018, when Brandstatter sent the records to the City, and January 2019, the City did not tell Napleton that it was in default, that the City was not going to pay, or that the City needed more information. In February 2019, the City told Brandstatter that Napleton did not complete the storm water detention project, after which Brandstatter sent an email to the mayor's office and Odelson explaining that Napleton did not proceed with the storm water detention because the MWRD was not going to approve the design that it had forwarded to the City.

¶ 29    Bradstatter identified an email that Odelson sent to Edward Napleton, who was Napleton's Chief Executive Officer, on August 20, 2019, and agreed that Odelson stated in the

11

email that, "[Brandstatter] and the city administrator have determined that the economic incentive agreement called for underground storage and reimbursement. [Brandstatter] said it was too expensive to do the underground work, which, of course, resulted in no reimbursement." Brandstatter testified that he did not tell that to Odelson shortly before this email. Brandstatter also testified about his response to Odelson's email, in which he stated,

> "It is not accurate to say that I was involved in any determination that the economic incentive agreement called for underground storage. As a matter of fact, the cover letter that transmitted the executed incentive extension specifically calls attention that underground detention is not a requirement."

¶ 30    Brandstatter further testified that Napleton's neighboring Hyundai and Kia dealerships were distinct operations but had the same Illinois Department of Revenue (IDOR) tax reporting numbers, as they were considered one location. In the materials Brandstatter sent to the City in 2018, he did not provide a breakdown of the sales tax paid by each of these entities. He testified that there was nothing in the first amendment that required Napleton to provide sales tax revenue figures to the City, as the IDOR provided these figures to the City. Under the original agreement, Napleton signed a consent to allow IDOR to share sales tax and revenue information with the City, and the City could receive this information from the IDOR or Napleton.

¶ 31    Brandstatter also testified that, based on his history with the City, the City would have paid the 2017 sales tax rebates in 2018, at the earliest. He testified that the City issued and generated building and occupancy permits, and prior to the day of trial, no one from the City had suggested to Napleton that its failure to provide the permits was a problem with obtaining reimbursement under the first amendment.

¶ 32    Burton Odelson testified that in 2010, he was involved in discussions with Napleton to bring a Kia dealership to Calumet City at the location where Napleton had previously operated a Honda dealership. The City wanted the Kia dealership because it generated "a tremendous amount" of sales and property tax revenue and the City "desperately wanted [Napleton] in Calumet City to generate the revenue and to put jobs" there. Odelson testified that he negotiated the original agreement with the City and Napleton in 2011, and under the original agreement, the City would pay Napleton $100,000 of tax revenue every year for six years provided that Napleton operated its dealership continuously in the City. The agreement was an "[e]xtremely good deal" for the City because it generated sales and property tax money.

¶ 33    Around 2013, Odelson learned that Napleton needed to make significant capital improvements to its Kia dealership. Odelson was involved in discussions with the City's mayor and representatives from Napleton about the improvements, during which Napleton advised the City that it "would be willing to make these improvements and stay at this location if they received more sales tax rebates for future years." According to Odelson, Napleton was the "largest tax provider" in the City, and the renovations would make Napleton a more attractive facility. At some point during the meetings with Napleton and the City, the parties discussed the "concept of sharing" in that the City would reimburse Napleton for 50% of the costs incurred on the renovations.

¶ 34    Odelson identified a letter that Brandstatter sent to an attorney in his office in December 2013, in which Brandstatter provided his proposed language for the first amendment, including a list of Napleton's planned renovations, which did not include the underground storm water detention facility or the parking lot expansion. The letter stated that the estimated cost of renovations was $1 million.

13

¶ 35        Odelson further testified that his firm drafted the first amendment and that an actual written agreement was not drafted until the fall of 2014. In November 2014, the draft written agreement was placed on the City Council's agenda at two different meetings, but it was taken off each time. At the City Council meeting on April 22, 2015, the City Council approved the ordinance approving the first amendment.

¶ 36        Odelson testified that when the City Council approved the first amendment, the renovations were already done. The City knew that Napleton had completed the renovations because before the April 22, 2015, meeting, the City's mayor and Odelson toured Napleton's facility and, at that time, the renovations were "substantially complete." The first amendment did not state that the renovations were substantially complete because the document "was presented to the committee about a year before it actually got to the city council" and, during that time, Napleton "had substantially completed all of the improvements."

¶ 37        Odelson testified that the first amendment described the renovations that Napleton had already completed, which were the same renovations Brandstatter provided in his 2013 letter to Odelson. These renovations included the replacement of the existing façade, a Kia sign package, realignment, an increase in the number of sales consultation spaces, expansion of the showroom, refurnishing of the entire sales floor area, replacement and addition of lighting fixtures, replacement and addition of ceiling tiles, and replacement of the roof.

¶ 38        Odelson testified that the first amendment also included in the list of renovations, the "installation of underground stormwater detention as depicted on Exhibit 1." There was no reference to the stormwater detention on "Exhibit 1." Asked whether the City added this language, he responded, "I don't really recall; but I think it was, yes" and that Brandstatter did not suggest it. He testified that the underground storm water detention was one item in a list of a number of

renovations, that it was not originally contemplated as one of the renovations, and that it "obviously became part of a discussion, but it was not the primary focus." According to Odelson, the "primary focus was fixing the location, making it look a lot nicer than it did, and expanding their sales tax and property tax base which benefited the city." He testified that the focus of the first amendment was "getting that store beautiful to attract customers" to create sales taxes and raise property taxes and that the underground storm water detention "was an afterthought." Odelson testified that he was not focused on the water detention and that he was "focused on generating dollars for the city and keeping the best dealership they had in the town." Odelson testified that he never saw any engineering drawings regarding the underground storm water detention and that moving the storm water detention provided "[z]ero" economic benefit to the City.

¶ 39     As for the clause in the first amendment that stated that, in reliance on Napleton developing and constructing the renovations and operating its existing Kia dealership on the dealership property, the City agreed to provide certain economic assistance, Odelson testified "that was the kicker to keep them there" and "[w]e needed to keep them there, and this was the bargain." If the City kept Napleton there for five more years, the City would get five more years of sales tax revenue. By doing the renovations and making it a more attractive facility, the City would get increased revenue and property tax revenue.

¶ 40     Odelson testified that the City Council did not waive any of the renovations provided in the first amendment, and there was nothing in that agreement stating the conditions were optional. Odelson identified the minutes from the April 22, 2015, City Council meeting, which included a provision that stated:

"Alderman Manousopoulos moved, seconded by Alderman Munda, to approve the first amendment contingent that the project is for renovation of the showroom and the relocation of the retention pond project. Bills to be submitted before the extension is paid and business must stay in Calumet City for two years after extension of the incentive agreement."

¶ 41 Odelson further explained that the first amendment provided that the City would pay Napleton "sales tax rebates for half the amount of the estimated cost," with the reimbursement amount capped at $500,000. Odelson identified the email he wrote to Brandstatter on December 30, 2018, in which he stated that he "asked the City to remit payment" and was "working with [the city administrator] to get it started." He testified that he recommended the City to "pay some portion of these invoices." Odelson testified that sales tax rebates are generally paid a year after the receipt and that the 2017 sales tax rebates would be paid in 2018. Odelson's office did not provide a default notice to Napleton.

¶ 42 Odelson identified a memo that the City's treasurer, Gerald Tarka, sent to the City's mayor on February 14, 2019. Odelson agreed that Tarka stated in the memo that, "I am of the belief that notwithstanding the issues of past deadlines and stale/dated aspects of the agreement, that it does not meet the requirements necessary for the City to pay from this agreement." He also testified that Tarka stated in that memo, that, "[w]hen the city council passed the first amendment in April 2015, the motion specifically called for the reimbursement of money contingent on the construction of an underground water retention facility" and "I do not believe that it is in the City's best interest to move forward on the existing agreement."

¶ 43 Kenneth Stevens, the Chief Financial Officer for Napleton, testified that Napleton spent between $1,025,000 and $1,061,000 on its renovations in 2014. To determine this amount, he reviewed the depreciation schedules and invoices that Napleton provided to the City in 2018. He

identified a summary of invoices sent to Napleton in 2018 and testified that every item in his summary related to the Napleton Kia location.

¶ 44    John Kasperek, the finance director for the City during the relevant time, testified that he was not involved in the negotiations with either of the agreements, and that in 2018, he reviewed Napleton's records that Brandstatter had compiled. He testified that the records were "a mess," explaining that "there was nothing attached to explain anything," that they contained "numerous other dealerships," including dealerships located in Florida, and the City could not "make heads or tails" out of what was related to the Napleton Kia dealership. He testified that the records included bills for automative equipment, which was not part of the agreement, and it was "very difficult to go through there and try to ascertain what belonged to what." Kasperek did not call anyone from Napleton requesting to go through the documents. He never created a report to identify which items were justifiable and which ones he had a problem with. He testified he learned from the previous witness's testimony at trial "about how these were put together." Kasperek also testified that when he received the initial documentation, he "perused—I looked at it" and then asked Tarka, the City's treasurer, to "sort these out."

¶ 45    Kasperek also testified that after he reviewed Napleton's records and compared them to the first amendment, he determined that Napleton failed to perform because it did not install the underground storm water detention and did not submit its invoices in time. In his review, he did not see any records related to the storm water detention project. He testified that under the first amendment, Napleton had to deliver its payment records to the City 60 days before the first payment was due, and that for the 2017 payment, the records should have been submitted in early 2018. Napleton submitted its documentation in late 2018. He also acknowledged that under the first amendment, there was no specific date for when the 2017 payment was due. Asked whether

he agreed that "historically the City had always paid one year in arrears on the sales tax—to Napleton," he responded, "[t]hat would have been the way the agreements were structured." Kasperek testified that there was nothing in the first amendment that permitted the City to pay Napleton for expenditures incurred before the April 22, 2015, effective date of that agreement. He agreed that Exhibit 1 attached to the first amendment did not mention underground storm water detention.

¶ 46    The court admitted Tarka's deposition into evidence. In Tarka's deposition, he testified that Kasperek asked him to review Napleton's records. In the February 14, 2019, letter that he sent to the City's mayor, he stated that he "didn't believe that it was in the city's best interest to do anything more with this with regard to this first amendment." He explained that Napleton did not timely submit its documentation as required under the first amendment, and it did not spend the total amount of money it was required to spend. He testified that the City would pay the 2017 payment in 2018.

¶ 47                          Closing Arguments

¶ 48    Following trial, the court ordered the parties to submit written closing arguments with findings of fact and proposed conclusions of law. The court specifically asked the parties to address the formation of an enforceable contract and the "issue of what actually was required under the contract for so-called water detention." The court observed that in the first amendment the storm water detention provision made "a specific reference to an attachment, which is *** purported to be a plan, but the plan shows nothing and the evidence in this case did not indicate there was any such plan that was appended."

¶ 49    In Napleton's closing brief, it argued that the first amendment was a valid and enforceable contract. Napleton asserted that in 2018, when it signed a copy of the first amendment,

18

it accepted the City's offer that the City had made in April 2015 and then re-extended in 2018. Napleton also argued that the plain terms of the first amendment showed that Napleton was not required to construct a storm water detention facility. According to Napleton, nothing in the first amendment suggested that the construction of the storm water detention was an essential term of the agreement, but it was just "one of a laundry list of renovations" that Napleton planned. Napleton asserted that the relocation of the storm water detention benefited Napleton, not the City, and what "matter[ed] to the City was that the Kia dealership remain open for five additional years and generate significant property tax revenue."

¶ 50    Napleton also argued that it was impossible to comply with the installation of the underground storm water detention facility. It explained that the provision in the first amendment regarding the installation of the stormwater detention facility required the installation "be in conformance with Exhibit 1 to the [first amendment] (which must be approved by the City's engineer)," but that the "Exhibit 1" attached to the first amendment did "not show underground stormwater detention" nor "state it was approved by a City engineer." The lack of storm water detention on "Exhibit 1" to the first amendment, Napleton argued, made it impossible for Napleton to comply with that provision.

¶ 51    In the City's closing brief, the City contended that the parties did not have a valid and enforceable contract because the parties did not have a meeting of the minds, as Napleton never accepted the first amendment that the City Council approved in April 2015. Rather, the City argued, Napleton rejected the first amendment when Napleton presented a counterproposal to the City in June 2015. The City also argued, among other things, that Napleton failed to perform under the first amendment because it did not install the underground storm water detention and the clear and unambiguous language of the contract required Napleton to install it. The City asserted that

the storm water detention was an essential and material term of the first amendment and that it was not impossible for Napleton to comply with the provision.

¶ 52    The City further argued that Napleton failed to timely submit proof of building permits, occupancy permits, and construction receipts confirming that it completed the renovations 60 days before the year 2017 payment was due because it did not submit invoices to the City until November 2018. The City also claimed it was not required to reimburse Napleton for the renovation expenses because Napleton completed the renovations before the effective date of the first amendment.

¶ 53                              Trial Court's Ruling

¶ 54    The trial court found in favor of Napleton and against the City on the breach of contract claim and ordered the City to pay Napleton $500,000, plus $118,560.79 in prejudgment interest. In a written order, the court provided a detailed summary of its factual findings, analysis, and conclusions. The court concluded that Napleton proved by a preponderance of the evidence that it complied with all the material terms of the first amendment and established that it is entitled to payment.

¶ 55    The trial court concluded that the first amendment was an enforceable and binding agreement. In doing so, it stated that Napleton "finally did sign the [first amendment] and submitted it in 2018" and "[n]othing in the [first amendment] or the 2011 [a]greement rendered the signing untimely, and the parties thereafter conducted their affairs on the assumption that the [first amendment] was now binding on the parties." The court also stated that the ordinance approving the first amendment provided that the first amendment was " 'approved substantially in the form presented to the City Council, with such necessary changes as may be approved by the

Mayor' " and that "[a]ccordingly, the City Council tacitly gave Napleton permission to propose a modification of the [first amendment]."

¶ 56    The court also concluded that the facts and circumstances rendered Napleton's performance of the installation of the underground storm water detention system impractical under the circumstances. It explained that Napleton had argued that the "installation of underground storm water detention was impossible" based on the fact that the installation had to be "constructed as depicted on Exhibit 1" and "subject to the approval of the City Engineer." The court stated, however, that "Exhibit 1 was a mere one-page site plan," without any " 'depiction' of an underground storm water detention system of any sort" and there was no evidence that the City's professionals adopted any plan. Even if Napleton wanted to install underground storm water detention at its site, the court stated, the first amendment "provided no direction or specification as to what exactly was to be installed."

¶ 57    The court further explained that Napleton learned that the storm water detention project "would possibly equal or approach the cost of all other Renovations completed—one million dollars," after which Napleton "decided to abandon the plan to expand parking ***." The court found that, "[t]hese cost and complications issues [*sic*] as well as the decision to avoid them were fully disclosed to the City" and that the "Mayor acknowledged as much." The court also found that, "[d]espite these circumstances, the City incorporated the underground storm water detention clause into the Renovations recital paragraph in the [first amendment] without the knowledge or consent of Napleton." The court stated that "imposing a requirement on Napleton to install a water detention system, for which there is no plan and for which there is no need, would impose substantial costs almost doubling the planned and acknowledged costs of Renovations, thereby imposing upon it severe and unreasonable additional costs which would result in a grave injustice."

¶ 58    The court also applied the doctrine of commercial frustration. The court stated that, "[s]ince Napleton abandoned the parking expansion project, there was no necessity for the underground water detention system" and, therefore, Napleton should be excused from installing one. The court further stated that "it would be impossible to install it anyway, as the specifically identified plan in the [first amendment] did not exist" and "the facts and circumstances here indicate that it would be unnecessary and of no utility to any party, a waste of resources."

¶ 59    The court noted that the installation of the storm water detention system was "inserted solely by the City without consultation with Napleton" and that, "[i]f the City seriously wished to include the water detention system, it would have so stated to Napleton in negotiations, which it did not." The court also stated that "the City interjected the subject clause, which contrary to its language provided no guidance on the required installation, as a substantial hurdle to be overcome before the City would be obliged to pay any rebates."

¶ 60    The court also concluded that the facts and circumstances showed that the installation of the underground water detention system was not material to the contract. In doing so, the court stated that, "neither party had any interest in installing an unnecessary underground water detention system, and the contrary was not proven or even suggested at trial." The court also found that the "absence of the system in no way has prejudiced or cause loss to the City." The court stated that "permitting the City to avoid paying the tax rebates would result in an unreasonable and unfair advantage, as the City would bear no costs, even though such costs were anticipated under the agreement, while Napleton would bear significant costs to stay in the City as opposed to moving outside the City with substantial cost savings."

¶ 61    This appeal follows.

¶ 62                                    II. ANALYSIS

22

¶ 63 On appeal, the City contends that the trial court erred when it found that the first amendment was a valid and enforceable agreement between the parties. The City argues that Napleton never accepted the first amendment that the City Council approved in April 2015. Rather, the City argues that Napleton's June 2015 letter to the City, which stated that Napleton removed reference to the underground storm water detention, was a counterproposal to the first amendment that rejected and nullified the first amendment approved by the City Council and required new approval by the City Council.

¶ 64 When a party challenges a judgment entered after a bench trial, generally, we will only reverse that judgment if it is against the manifest weight of the evidence. *Cadle Properties of Illinois, Inc. v. Fortune Investments, LLC*, 2021 IL App (1st) 200556, ¶ 23. A trial court's "decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). Under this standard, " 'we give deference to the trial court as the finder of fact, because it is in the best position to observe the conduct and demeanor of the parties and witnesses.' " *Slyce Coal Fired Pizza Co. v. Metropolitan Square Plaza, LLC*, 2025 IL App (1st) 221279, ¶ 135 (quoting *Archon Construction Co. v. U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, ¶ 26).

¶ 65 To prove a breach of contract claim, a plaintiff must establish that a valid and enforceable contract exists, plaintiff performed under the contract, defendant breached the contract, and injury resulted. *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 85. Here, the City argues that Napleton failed to prove the existence of a valid and enforceable contract.

¶ 66      To form an enforceable contract, "there must be an offer and acceptance, consideration, and valid and certain contractual terms." *Lindy Lu LLC v. Illinois Central R.R. Co.*, 2013 IL App (3d) 120337, ¶ 21. "An enforceable contract must also include a meeting of the minds or mutual assent as to the terms of the contract." *Gaines v. Ciox Health, LLC*, 2024 IL App (5th) 230565, ¶ 28. "Generally, it is the objective manifestation of intent that controls whether a contract has been formed." *Urban Sites of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 51. "The subjective understanding of the parties is not required in order for there to be a meeting of the minds." *Id.* "Only the parties' overt acts and the communications between them may be considered in determining whether and upon what terms they have entered into a contract." *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 20. "The most common way by which mutual assent can be shown is through a signature on a contract." *Id.* ¶ 21. Further, "[a]n acceptance conditioned on the modification of terms in an offer generally constitutes a rejection of the offer and becomes a counter-offer that the original offeror must accept before a valid contract is established." *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 980 (1997). If an offer is accepted conditionally, or if a new term is introduced in an acceptance, then there is no acceptance. *Loeb v. Gray,* 131 Ill. App. 3d 793, 799 (5th Dist. 1985). Rather, that conditional acceptance becomes a counterproposal that requires acceptance by the original offeror. *Id.* However, "[a] mere inquiry regarding the possibility of different terms, a request for a better offer, or a comment upon the terms of the offer, is ordinarily not a counter-offer." Restatement (Second) of Contracts § 39, Comment b (1981).

¶ 67      The issue of "whether a contract exists, its terms, and the parties' intent" (*Pepper Construction Co.*, 2016 IL App (1st) 142754, ¶ 81) as well as whether there was mutual assent to the contract's terms are questions of fact. *Arbogast*, 2021 IL App (1st) 210526, ¶ 20.

¶ 68    Initially, we note that Napleton argues that the City is barred from contesting the validity of the contract because before the litigation, it never asserted that the first amendment was invalid due to "no meeting of the minds." Napleton also posits that before trial, the City asserted that the first amendment was valid and repeatedly sought to enforce its terms against Napleton. Napleton notes that the City's affirmative defenses alleged that Napleton failed to comply with the provisions in the first amendment, not that the first amendment was invalid, and the City's answer and pretrial memorandum did not dispute the validity of the first amendment. During trial, the City sought to amend its affirmative defenses, which the trial court denied. However, the court stated that it was Napleton's "obligation to prove the existence of a contract" and, if there was "no meeting of the minds, then there is no contract." It explained that Napleton had the obligation to establish the elements of the contract, and that the City was permitted to "bring in evidence that no contract was formed."

¶ 69    "It is well settled that issues not raised in the trial court are deemed forfeited and may not be raised for the first time on appeal." *Martinez v. River Park Place, LLC*, 2012 IL App (1st) 111478, ¶ 29. As previously noted, to succeed on its breach of contract claim, Napleton had to prove the existence of a valid and enforceable contract. See *Pepper Construction Co.*, 2016 IL App (1st) 142754, ¶ 85. Here, at trial, the City argued that the parties did not have a valid and enforceable contract and never had a meeting of the minds. It asserted that Napleton never accepted the first amendment approved by the City Council but rather presented a counterproposal in June 2015 that omitted the storm water detention provision and rejected the first amendment. Accordingly, the City did not forfeit its argument that the parties did not have a valid and enforceable contract.

¶ 70      We now turn to the City's argument that the trial court erred when it found the first amendment was a valid and enforceable agreement between the parties. The trial court found that the first amendment approved by the City Council in 2015 and signed by Napleton in 2018 was a binding and enforceable contract. The court's conclusion is not against the manifest weight of the evidence. The evidence presented shows that the City Council approved the first amendment on April 22, 2015, and that in 2018, the City's attorney tendered that agreement to Napleton for its signature. Napleton signed that agreement on October 30, 2018. There is no evidence that Napleton had to sign the first amendment approved on April 22, 2015, by a certain date for it to be valid and enforceable.

¶ 71      We note that the City asserts that, to show that the parties formed a valid and enforceable contract, Napleton "had to prove the City Council approved whatever version of the Contract Napleton was seeking to enforce." However, the agreement Napleton was seeking to enforce was the agreement that the City Council approved on April 22, 2015.

¶ 72      The City also asserts that Napleton rejected the City's offer of the first amendment approved by the City Council and proposed a counteroffer when Napleton sent the City the June 2015 letter, in which it stated that the first amendment was revised to "remove reference to the stormwater detention as part of the renovations." According to the City, the June 2015 letter was a counteroffer that rejected the first amendment and required approval by the City Council.

¶ 73      As previously noted, "[a] mere inquiry regarding the possibility of different terms, a request for a better offer, or a comment upon the terms of the offer, is ordinarily not a counter-offer." Restatement (Second) of Contracts § 39 (1981). Further, "simply because a communication discusses the possibility of modification does not necessarily mean that the communication is a demand for modification." *Hubble*, 291 Ill. App. 3d at 980.

26

¶ 74      Here, the evidence was sufficient to support the trial court's finding that Napleton's June 2015 letter informing the City that it removed the reference to the installation of the storm water detention facility did not amount to a counteroffer that rejected the first amendment. The evidence shows that when Napleton sent the City the June 2015 letter, the City knew that Napleton was not going to proceed with the storm water detention project as one of its numerous renovations, as Brandstatter testified that by March 2015, Napleton had informed the City of its plan not to proceed with that project. Further, the City never responded to Napleton's June 2015 letter, and, as previously discussed, in 2018, the City tendered to Napleton and requested Napleton's signature on the April 22, 2015, agreement approved by the City Council, and Napleton signed that version, which supports that both parties understood that the first amendment dated and approved by the City Council on April 22, 2015, was the contract between the parties.

¶ 75      We also note that the ordinance approving the first amendment provided that the first amendment "is hereby approved substantially in the form presented by City Council, with such necessary changes as may be approved by the Mayor." As such, under the ordinance, Napleton was permitted to request necessary changes to the first amendment, as may be approved by the City's mayor. From this evidence, the trial court could reasonably conclude that Napleton's June 2015 letter was not a counteroffer that rejected the City's offer.

¶ 76      The City also contends that, even if the first amendment was enforceable, Napleton failed to comply with the terms of the contract, because it failed to install the underground storm water detention system. The City argues the trial court erred when it held that the storm water detention provision was not a material term of the first amendment such that Napleton was not required to install the system in order to receive reimbursement from the City.

¶ 77　　　Generally, "only a material breach of a contract provision by one party will justify nonperformance by the other." *William Blair & Co., LLC v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 346 (2005). "A material breach of contract constitutes the 'failure to do an important or substantial undertaking set forth in a contract.' " *LB Steel, LLC v. Carlo Steel Corp.*, 2018 IL App (1st) 153501, ¶ 31 (quoting *Mayfair Construction Co. v. Waveland Associates Phase I Ltd. Partnership*, 249 Ill. App. 3d 188, 202-03 (1993)). "The test of whether a breach is material is whether it is so substantial and fundamental as to defeat the objects of the parties in making the agreement or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement." *Slyce Coal Fired Pizza Co.*, 2025 IL App (1st) 221279, ¶ 139. Stated another way, "[t]he breach must be so material and important to justify the injured party's conclusion that the whole transaction is at an end." *Village of Fox Lake v. Aetna Casualty & Surety Co.*, 178 Ill. App. 3d 887, 901 (1989). In addition, "[t]he materiality of a breach depends on 'whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage.' " (Internal quotation marks omitted.) *Direct Auto Insurance Co. v. O'Neal*, 2022 IL App (1st) 211568, ¶ 15 (quoting *William Blair & Co.*, 358 Ill. App. 3d at 346-47).

¶ 78　　　"Whether a material breach of contract has been committed is a question of fact." *LB Steel, LLC*, 2018 IL App (1st) 153501, ¶ 31. Thus, we will not disturb the trial court's determination "unless it is against the manifest weight of the evidence." *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 72 (2006).

28

¶ 79    The trial court's conclusion that Napleton's failure to install the storm water detention facility was not a material breach is not against the manifest weight of the evidence. In reaching this conclusion, the trial court found that "neither party had any interest in installing an unnecessary underground water detention system" and that the absence of the system did not prejudice or cause a loss to the City. The evidence supports the trial court's findings.

¶ 80    The evidence shows that the storm water detention project was not initially included in the list of renovations for which the City would reimburse Napleton. Brandstatter testified that Kia required Napleton to upgrade its dealership to remain compliant with Kia's requirements, which included improvements to the showroom, bathrooms, and service areas. He testified that, thereafter, the parties reached an oral agreement whereby they would extend the agreement for 5 more years and the City would reimburse Napleton for 50% of the renovation costs, which Napleton had estimated would exceed $1 million. Brandstatter's letter to the City's attorney in 2013 reflected his understanding of the oral agreement, subject to approval, that the parties had reached, which did not include the storm water detention as one of the renovations in the list of renovations. Likewise, Odelson, who drafted the agreement for the City, testified that the underground storm water detention was not originally contemplated as one of the renovations. He testified that the storm water detention was an "afterthought" and that the "primary focus was fixing the location, making it look a lot nicer than it did, and expanding their sales tax and property tax base which benefited the city."

¶ 81    As for when the parties started discussing the underground storm water detention as one of the renovations, the evidence shows that, at some point, Napleton started discussing a parking lot expansion, which would require an underground storm water detention facility. However, by March 2015, Napleton informed the City that it was not going to proceed with that

project, as it was not feasible from a cost or operations perspective. The fact that Napleton decided not to proceed with installation of the underground storm water renovation did not prejudice the City, as the City did not benefit from the project. Odelson testified that the storm water detention provided zero economic benefit to the City, and Brandstatter testified that the storm water detention facility would not have benefited the nearby landowners. In addition, the evidence shows that Napleton completed all other renovations to improve the dealership and spent over $1 million to do so, which Napleton had initially estimated it would spend.

¶ 82 Accordingly, the evidence is sufficient to support the conclusions that Napleton's failure to perform the storm water detention renovation did not render the performance of the rest of the agreement different in substance from the original agreement and that the installation of the stormwater detention facility was not so material to invalidate the agreement as a whole.

¶ 83 In addition, the trial court found that allowing the City to "avoid paying the tax rebates would result in an unreasonable and unfair advantage, as the City would bear no costs, even though such costs were anticipated under the agreement, while Napleton would bear significant costs to stay in the City as opposed to moving outside the City with substantial cost savings." This finding is also supported by the evidence presented at trial.

¶ 84 The evidence shows that Napleton relied on the City's promise to pay 50% of the renovation costs when it stayed at the location in Calumet City and then spent over $1 million on the renovations, which improved the dealership and benefited the City. Odelson testified that when the parties were negotiating the first amendment, Napleton advised the City that it "would be willing to make these improvements and stay at this location if they received more sales tax rebates for future years." Brandstatter testified that Napleton relied on the City's commitments to pay when it completed the renovations, which cost Napleton $1 million. Further, the evidence shows

that Napleton's renovations ultimately benefited the City, as Odelson testified that Napleton was the "largest sales tax provider in the City" and that the intent of agreement was to make "the store beautiful to attract customers" in order to create sales taxes and raise property taxes. However, while the City benefited from Napleton's renovations, the City was only required to pay 50% of costs, with a total limit of $500,000. This evidence was sufficient to support the trial court's finding that, if the City is allowed to avoid paying Napleton under the first amendment, it would result in an unreasonable or unfair advantage.

¶ 85    Accordingly, the evidence was sufficient for the trial court to reasonably conclude that Napleton's failure to install the underground detention facility was not a material breach. The trial court's determination was not against the manifest weight of the evidence.

¶ 86    The City also contends that the trial court erred when it applied the doctrines of impossibility and commercial frustration and found that Napleton was excused from performing the installation of the underground stormwater detention facility under these doctrines. Given our findings, we need not address these arguments.

¶ 87    Lastly, the City contends that Napleton failed to fulfill its other obligations under the first amendment. The City asserts that Napleton failed to submit building permits, occupancy permits and construction receipts confirming that the renovations were complete 60 days before payment for year 2017 was due as required under the first amendment. The first amendment states that, "[b]efore any payment is made to [Napleton] for years beginning 2017 through 2021, [Napleton] shall provide to City sixty (60) days prior to the first payment for year 2017 is due, proof of building permits, occupancy permits and construction receipts confirming that the Renovations on the Dealership Property have been completed." The City asserts that Napleton did not timely submit its invoices because Napleton submitted them in November 2018.

¶ 88    The evidence shows that the City paid Napleton its tax rebates one or two years in arrears. Brandstatter testified that the City would pay in arrears and "sometimes significantly in arrears." He identified Napleton's request for admission to the City and testified that it accurately showed when the City made its payments under the original agreement. It provided that the City paid the 2011 and 2012 sales tax rebate in October 2013, the 2013 payment in August 2014, the 2014 payment in July 2015, the 2015 payment in April 2016, and the 2016 payment in August 2017. Likewise, Kasperek testified that "historically the City had always paid one year in arrears on the sales tax," and Odelson testified that the City would pay sales tax rebates one year after the receipt such that the City would make the 2017 payment in 2018. Accordingly, the evidence shows that the City would pay its sales tax rebate in the subsequent year such that it would pay Napleton the 2017 sales tax rebate in 2018.

¶ 89    However, the evidence cited above also showed that the City was inconsistent regarding the exact date in the year on which it would pay Napleton the sales tax rebates due to Napleton from the previous year such there was no specific date by which Napleton had to submit its receipts. We note that, although the City's finance director testified that Napleton's receipts would have been due in early 2018, he also acknowledged that there was nothing in the first amendment that provided by which specific date Napleton had to submit its receipts. As such, given this evidence, the trial court could reasonably conclude that Napleton fulfilled its obligations regarding its submission of its construction receipts when it submitted the receipts for the 2017 payment in November 2018.

¶ 90    The City also asserts that Napleton did not sufficiently establish what it spent on renovations. The evidence shows that Napleton spent over $1 million on the renovations, as Napleton's Chief Financial Officer testified that Napleton spent between $1,025,000 and

$1,061,000 on its renovations. He also identified a summary of invoices that Napleton sent to the City in 2018 and testified that every item in the summary related to the Napleton Kia dealership. The evidence was sufficient for the trial court to reasonably conclude that Napleton established that it spent over $1 million on the renovations.

¶ 91    The City asserts that Napleton did not comply with the first amendment because the renovations it sought reimbursement for were completed before the effective date of the first amendment such that City is not required to reimburse Napleton for the expenses. The evidence shows that, in 2013, the parties started discussing the renovations that Napleton needed to make in order to remain compliant with Kia's requirements. The evidence supports that, before the City Council approved the April 22, 2015, first amendment, the City knew that Napleton had already completed the renovations, as Odelson testified that when the City Council approved the first amendment, the City knew that Napleton had completed the renovations. Further, the City does not cite to where in the first amendment Napleton was required to wait to start renovations before the effective date of the first amendment. Accordingly, the evidence was sufficient to support the conclusion that Napleton complied with the first amendment when it completed the renovations before the effective date of the first amendment.

¶ 92    The City also claims that Napleton did not comply with the first amendment because it failed to submit building permits and did not provide the City with proper sales tax documentation. As for the building permits, the evidence shows that the City had access to the permits, as Brandstatter testified that the City issued the permits and that without the permits, Napleton would not have been allowed to construct the improvements.

¶ 93    As for the City's argument that Napleton failed to provide proper sales tax documentation, the evidence shows that the City received sales tax and revenue information from

the IDOR. Brandstatter testified that there was nothing in the first amendment that required Napleton to provide sales tax revenue figures to the City and that the IDOR provided these figures to the City. He also testified that under the original agreement, Napleton signed a consent to allow the IDOR to share sales tax and revenue information to the City, and that the City could receive this information from the IDOR or Napleton. The trial court found that Napleton proved that it complied with all the material terms of the first amendment and established Napleton was entitled to payment of the sales tax rebate. The trial court's finding is not against the manifest weight of the evidence.

¶ 94                                    III. CONCLUSION

¶ 95        We affirm the trial court's judgment that found in favor of Napleton and against the City.

¶ 96        Affirmed.